**ATLANTIC BANANA COMPANY, Plaintiff-Appellee,**

v.

**STANDARD FRUIT & STEAMSHIP COMPANY, Defendant-Appellant.**

**No. 73–2941.**

United States Court of Appeals, Fifth Circuit.

April 26, 1974.

Rehearing Denied June 11, 1974.

As Modified on Clarification June 27, 1974.

H. Barton Williams, Bernard Marcus, Paul A. Gaudet, Eberhard P. Deutsch, New Orleans, La., for defendant-appellant.

Walter J. Suthon, Jr., Nigel E. Rafferty, Walter W. Christy, John Blackwell, New Orleans, La., for plaintiff-appellee.

Before DYER, MORGAN and RONEY, Circuit Judges.

DYER, Circuit Judge:

In this diversity action, Standard Fruit and Steamship Company appeals from the district court's judgment that a binding contract existed between Standard and Atlantic Banana Company for the purchase, importation and sale of Ecuadorian bananas and that Standard was liable for breach of the agreement. The district court awarded Atlantic $566,530.60 in damages, plus interest from the date of the interlocutory

decree imposing liability. We affirm the court's determination of liability, but reverse in part with respect to damages.

In 1960, the highly competitive American banana market was in disarray as a result of excessive importation of fruit from Central America. To stabilize import levels and reduce mounting corporate losses, Standard initiated negotiations with other banana importers concerning the establishment of importers' cooperatives. Through joint efforts with competitors in purchasing and importing fruit, Standard hoped to achieve an orderly supply of bananas and thereby alleviate flooded market conditions. Standard's overtures were rewarded, as Ecuadorian Fruit Import Corporation, which operated on the east and west coasts, agreed during the summer of 1960 to enter into an importing arrangement with Standard. Spurred by this success, Standard then contacted various importers operating in Gulf markets, Standard's traditional competitive area, including Atlantic Banana Company of Miami, Florida. After several meetings, Atlantic and Standard orally agreed in December, 1960, to enter into a cooperative venture covering three Gulf ports. Under the agreement, Standard's purchasing subsidiary would purchase Ecuadorian bananas for the accounts of both parties; both Standard and Atlantic would charter vessels to ship the fruit; the bananas would be unloaded and sold by the parties' subsidiaries in the Gulf ports; and the parties would divide net profits equally pursuant to a monthly accounting. The parties agreed that Standard would assume primary responsibility for unloading and selling fruit discharged in New Orleans and that Atlantic would handle bananas shipped into Tampa and Galveston. The initial term of the cooperative venture was to expire on June 1, 1961, with automatic extension for another year unless notice of termination was given prior to April 30, 1961.

■ The parties began operations under the cooperative in early 1961. During the ensuing period of active and successful operations, successive written drafts of a formal contract were prepared by Standard and presented to Atlantic. No draft was signed by Atlantic, however, since various adjustments and modifications were continually being made by the bipartite committee which constituted the cooperative's governing body and since no draft fully incorporated all terms already agreed upon. When the notice date in April, 1961 passed without either party's terminating the agreement, Standard's executive on the bipartite committee telegrammed Atlantic suggesting that until execution of the written agreement the parties should "continue informally under [the] terms [of the] unsigned contract." Consistent with Standard's suggestion, the parties continued under the arrangement without benefit of a written contract until April, 1962, when Atlantic, pursuant to a fervent request by Standard's chief counsel, signed and returned a proposed draft prepared by Standard, which provided *inter alia* for six-months' notice of termination. Along with the signed draft, Atlantic sent a five-point cover letter containing certain suggestions and amendments, each of which was acceded to telephonically by Standard's counsel before Atlantic signed the agreement. Upon receipt of the signed draft and cover letter, however, no Standard officer with executive authority signed or executed either document. Standard's corporate secretary did attest to the written draft and placed the corporate seal thereon, but no other Standard officer ever signed the draft.[1]

---

1. It is true that a Standard intra-company memorandum, a copy of which was delivered to Atlantic, stated that Standard's president had signed the contract. It is also true that affixing the corporate seal on a contract constitutes prima facie evidence that it was affixed by proper authority. The evidence shows, however, that Standard's president actually signed a different, tripartite cooperative agreement which was mistakenly assumed by the author of the memorandum to be the Standard-Atlantic contract. Despite

During the course of the negotiations concerning the written draft, a dispute arose over profits being realized by Atlantic on its stevedoring operations in Tampa and Galveston. Standard protested that under the arrangement all charges were to be at cost, with neither party realizing profits at the expense of the other. Atlantic rejected this interpretation, pointing out that the parties had initially agreed on fixed rates for stevedoring, as opposed to an "at cost" basis, and argued that Atlantic's entire profit from the cooperative stemmed exclusively from its efficient stevedoring operations. Atlantic accordingly refused to alter its stevedoring rates, whereupon Standard threatened on several occasions to terminate the venture unless its interpretation prevailed. The parties' relationship deteriorated during the remainder of 1962, and in December of that year, Standard notified Atlantic that the cooperative would be dissolved in March, 1963, despite Atlantic's final capitulation on the stevedoring issue and its protest that the three-months' termination notice was inadequate under the termination provision of the agreement. Following the dissolution of the cooperative in March, Atlantic revived its Ecuadorian purchasing operations, which had been suspended during the existence of the cooperative, and chartered necessary vessels, but was unable to resume full-scale operations until June, 1963. This action for breach of contract followed.

The district court concluded that the parties had entered into a binding oral agreement in December, 1960; that the written accord of April, 1962 was also valid and enforceable; and that Standard's notice of termination constituted a material breach of the agreement. Damages were ascertained for the following items: (1) the net profits which Atlantic would have realized during the three-month period extending from the termination of the contract until Atlantic's full resumption of operations; (2) stevedoring profits which Atlantic's subsidiaries would have realized but for the breach; (3) recovery for Atlantic's overpayments to Standard during the term of the contract; (4) recovery of sales costs during the existence of the agreement for bananas marketed by Atlantic in excess of its commitment to sell fifty percent of the cooperative's bananas, and (5) one-half of the net income realized from the sale of bananas aboard the M/V ONDINE and the M/V HAR GILEAD, two vessels in the service of Standard's separate cooperative with Ecuadorian Fruit Import Corporation and which were diverted from New York to New Orleans as a result of a longshoremen's strike on the east coast.

## CONTRACT VEL NON

■ After a thorough review of the record, we are convinced that the district court rightly determined that the parties entered into a valid oral contract in December, 1960. The record is replete with evidence that the parties reached agreement on the material terms of the cooperative in late 1960. Statements and actions by both Standard and Atlantic following this oral accord completely belie the contention that the parties were merely engaged in a loose association precatory only in effect and terminable at will. In communicating with Atlantic, as well as its own stockholders and other importers, Standard referred to the arrangement as a "contract" or "agreement." Highly specific terms governing various aspects of a complicated business arrangement were fully agreed upon, and the parties undertook full performance of the venture for a substantial period of time. In reliance upon Standard's greater purchasing abilities in Ecuador, Atlantic dissolved its buying subsidiary and released certain vessels previously under

the prima facie effect of the secretary's affixing Standard's corporate seal, a determination that the written contract was duly entered into and was therefore binding on

the parties is unnecessary to the result in this case, since an enforceable oral agreement was assented to by both parties.

charter. Conversely, Standard benefited directly from Atlantic's effective sales organizations in Tampa and Galveston, which enhanced Standard's penetration of markets served by those ports. Enjoying greater profits under the cooperative, both parties acted throughout the venture as if they were contractually bound by the 1960 agreement. As one of Standard's own officers succinctly stated at trial: "[W]e were importing fruit every week, [so] there must have been some sort of agreement. One just doesn't do this without any agreement."

■ Despite this evidence, Standard urges that mere "joint operations" were being conducted, numerous details of which were never fully agreed upon, and that as a consequence no "meeting of the minds" was ever reached. Underlying Standard's contention is the unfounded thesis that if subsequent disputes arise over material terms of an agreement, then the terms themselves are without binding force. Standard does not dispute, nor could it, that material details of this complex venture were sufficiently agreed upon in December, 1960 to permit successful operations over a lengthy period. For example, there is no disagreement that stevedoring rates under the cooperative were fixed by the parties at exact amounts. What Standard argues is that the parties had different subjective views as to what these fixed rates represented and that this variance in subjective attitude rendered contractual assent nugatory. Even assuming *arguendo* the validity of this subjective theory of contract law, we cannot find clearly erroneous on the evidence of record the judge's conclusion that profits on the parties' various operations were, in fact, originally contemplated. On the contrary, substantial testimony supports the view that Standard itself was realizing profits of five cents or more on the ten cents per stem pur-

chasing commission, ostensibly designed to cover administrative costs, while simultaneously taking Atlantic to task for enjoying profits from stevedoring rates, precisely fixed by the parties, at a level below that charged by Standard's own stevedoring firm, and commensurate with Atlantic's then prevailing rates applicable to other customers.

■ This record abundantly supports the conclusion that more than informal, non-obligatory "joint operations" were conducted, even though the agreement was never signed by both parties after being reduced to writing. Moreover, under Louisiana law, where one party drafts a contract and presents it to the offeree for signing, the contract is valid and binding upon the offeree's acceptance even if the offeror subsequently fails or refuses to sign the document. Thus, even accepting Standard's argument that execution of the formal contract was a condition precedent to liability under Louisiana law, Sterkx v. Gravity Drainage Dist. No. 1 of Rapides Parish, La.App.1968, 214 So.2d 552, 553, substantial Louisiana authority supports the conclusion that a binding formal agreement was entered into by the parties. See Auto-Lec Stores v. Ouachita Valley Camp No. 10, W.O.W., 1936, 185 La. 876, 171 So. 62, 64; Dyer v. Varnell, La.App.1960, 121 So.2d 598, 599.

In addition, no serious contention can be made that the parties intended to enter legally binding relations only upon subsequently reducing the oral agreement to writing. See, e. g., Breaux Brothers Construction Co. v. Associated Contractors, Inc., 1954, 226 La. 720, 77 So.2d 17; Ferre Canal Co. v. Burgin, 1901, 106 La. 309, 30 So. 863. Instead, the evidence is clear that, as prudent businessmen, the parties simply intended to memorialize their already obligatory agreement, rather than create a condition precedent to liability.[2]

2. As the district court found, the parties began operations under the oral agreement almost immediately, before a formal agreement was ever drafted. Only a memorandum enti-

tled "Gulf Ports Banana Merchandising Agreement" was prepared during this early period, but this document was directed primarily to a Chilean businessman, not Atlan-

■ Since a valid oral agreement was reached on all material terms of the venture, Standard committed an actionable breach by its premature termination of the cooperative, an action inconsistent with the obligation which it assumed. L.S.A.–C.C. art. 1931; United Shoe Stores Co. v. Burt, La.App.1932, 142 So. 370, 371. Its threats of termination issued prior to December, 1962, were under no reasonable view actual notice of termination, as Standard would now have it, and thus inadequate notice of cancellation was afforded.[3] Even assuming that the formal, written contract was binding on neither party, we nevertheless conclude that the document, with its provision for six-months' notice of termination, accurately reflected in this respect the terms of the binding oral accord entered into earlier. Indeed, the written draft signed by Atlantic specified that it was executed as of July 1, 1961, although it was in actuality signed only in 1962. Furthermore, even if we accept Standard's argument that no precise notice provision governing a post-June 1, 1961 termination was agreed upon at meetings following the original termination notice date of April 20, 1961, the six-months' notice called for by the parties themselves in the written draft constitutes, under the circumstances of this complex business arrangement, "reasonable notice" which the law requires to terminate a valid contract. *Cf.* Sylvan Crest Sand & Gravel Co. v. United States, 2 Cir. 1945, 150 F.2d 642, 644.

## DAMAGES

■ The court's itemization of damages, including lost profits to Atlantic's subsidiaries on stevedoring,[4] is fully supported by the evidence, except with respect to damages arising from Standard's refusal to remit to Atlantic proceeds from the sale of fruit aboard the ONDINE and HAR GILEAD. The evidence unmistakably shows that these two ships were connected with Standard's entirely separate import cooperative with Ecuadorian Fruit Import Corporation and were discharged in New Orleans only because of a forced diversion from New York. The significance of this separate ownership of the cargo is that the contract between Standard and Atlantic expressly provided that the parties could continue to compete with each other during the existence of the cooperative. We agree with Standard's contention that the discharge of these two vessels by another cooperative fits squarely within this understanding by the parties, as reflected in the written draft. Moreover, Atlantic had no interest whatsoever in the cargo under any theory of the transaction until the vessels' arrival in New Orleans. It is of critical importance in this respect that the terms of the Standard-Atlantic arrangement provided that bananas would be purchased in Ecuador for the accounts of both parties. Atlantic would thus become liable to Standard under the cooperative arrangement at the time of purchases of bananas in Central America. With respect to the cargo of the ONDINE and HAR GILEAD, on the other hand, Atlantic indisputably was subjected to no liability to Standard at any point, since the fruit was purchased and shipped for the account of an entirely different arrangement. Viewed in this light, these two transactions are clearly outside the coverage of the cooperative.[5] This element of damages

tic, and was designed for informational purposes, not for formal execution. Appendix, Vol. IV, at pp. 1088 et seq.

3. The district court properly concluded that notice of termination of a contract must be sufficiently clear and unequivocal to clearly apprise the other party of the action being taken. Unequivocal notice was afforded only in December, 1962 that the cooperative would be terminated during March, 1963.

Considerably less than six-months' notice was therefore afforded.

4. The court properly found that under the circumstances of this case Atlantic could recover damages on behalf of its stevedoring subsidiaries.

5. The fact that Atlantic participated in the sale of cargo aboard the M/V ASSEBURG in December, 1962, which was also in the

cannot stand. L.S.A.–C.C. art. 1934; Harper v. Home Indemnity Co., La.App 1962, 140 So.2d 653, 660.

In all other respects, including the award of interest from the date of the interlocutory decree finding liability, the judgment is correct. We therefore affirm as to liability and as to damages except those damages arising from the shipments on the ONDINE and HAR GILEAD, which we reverse. The case is remanded to the district court for further proceedings consistent with this opinion.

*Affirmed in part, reversed in part and remanded.*

service of the Standard-Ecuadorian Fruit cooperative is irrelevant in determining Atlantic's rights in the proceeds from the later sale of cargo aboard the ONDINE and HAR GILEAD. The evidence clearly shows that Ecuadorian Fruit's one-half interest in the ASSEBURG's cargo was sold to Atlantic before the vessel was unloaded in Tampa.

Upon the sale of Ecuadorian's one-half interest, Atlantic as part owner of the cargo was obviously entitled to participate with Standard in the net profits derived from subsequent sales. No such sale of Ecuadorian's interest to Atlantic occurred with respect to the ONDINE and HAR GILEAD.