**AIR EAST, INC., d/b/a Allegheny Commuter, et al., Petitioners,**

v.

**NATIONAL TRANSPORTATION SAFETY BOARD and Alexander P. Butterfield, Administrator of the Federal Aviation Administration, Respondents.**

**Nos. 74–1542 and 74–1914 to 74–1918.**

United States Court of Appeals, Third Circuit.

Argued Feb. 7, 1975.

Decided March 13, 1975.

As Amended May 22, 1975.

---

Walter E. Rutherford, Haight, Gardner, Poor & Havens, New York City, for petitioners.

Carla A. Hills, Asst. Atty. Gen., New York City, William Kanter, Anthony J. Steinmeyer, Morton Hollander, Appellate Section, Civ. Div., Dept. of Justice, Washington, D. C., for respondents.

Before ADAMS, ROSENN and WEIS, Circuit Judges.

OPINION OF THE COURT

WEIS, Circuit Judge.

In legislating on air travel safety, Congress has recognized that the duty of air carriers is to perform their services "with the highest possible degree of safety in the public interest," 49 U.S.C. § 1421(b). With that standard as a backdrop, we consider these appeals from the revocations of certification of an air taxi line, several of its pilots, and its chief mechanic. A review of the record establishes to our satisfaction that the action of the National Transportation Safety Board is supported by substantial evidence, and we affirm.

Air East is a commuter airline authorized to furnish passenger and mail delivery service to a number of communities in western and central Pennsylvania, including Pittsburgh, Johnstown, Altoona, Bradford, and DuBois. It was certified by the Federal Aviation Administration [F.A.A.] on August 29, 1969. Petitioners Charles Allan McKinney, James A. Tallent, and Jeffrey H. Wilkinson were senior pilots with Air East who held pilot's licenses issued by the F.A.A.[1] Additional petitioners are Air East (Repair Station), a separate corporation which operated an aircraft repair facility in Johnstown pursuant to a certificate issued on August 21, 1970, and Thomas Reddecliff, an F.A.A. certified mechanic who supervised the repair station operations.

Air East operated without mishap until the evening of January 6, 1974, when a flight originating in Pittsburgh crashed on its approach to the runway in Johnstown, killing twelve of the occupants. Although there had been prior anonymous complaints to the federal authorities about some of Air East's practices, the crash precipitated a general investigation[2] of the carrier's operation in addition to the inquiry specifically directed to the cause of the accident.[3] During the period from January 18 to March 4, 1974, the F.A.A. interviewed a number of witnesses, deposed twenty-five persons, including present and former Air East employees, and examined the company records of aircraft maintenance and pilots' operations. On March 7, 1974, the Administrator issued an "emergency" order revoking the air taxi certificate held by Air East d/b/a Allegheny Commuter, the repair station certificate, the pilot certificates of McKinney, Tallent, and Wilkinson, and the mechanic certificate of Reddecliff.[4]

Petitioners immediately filed an appeal, and on March 21, 1974, a hearing commenced before an administrative law judge of the National Transportation Safety Board [N.T.S.B.]. After twenty-five days of testimony and argument, on April 24, 1974 the administrative law judge issued his oral decision, sustaining the revocation. The Board affirmed in an opinion issued on May 10, 1974,[5] and

1. Tallent held an Airline Transport Pilot certificate, and McKinney and Wilkinson had Commercial Pilot certificates.

2. This probe was authorized by 49 U.S.C. § 1429(a), which empowers the Administrator of the F.A.A. to "reinspect" periodically any licensee's conduct and to "reexamine" any civil airman. The result of reinspection or reexamination, if "safety in air commerce or air transportation and the public interest requires," may be the "amending, modifying, suspending, or revoking" of any certificate issued by the F.A.A.

3. 49 U.S.C. § 1441(a)(2)–(5) requires the Administrator to investigate accidents involving civil aircraft, report the facts of each, and take

steps to remedy such incidents and prevent their recurrence.

4. This action was taken pursuant to 49 U.S.C. § 1429 which permits immediate revocation in an emergency and provides that an appeal by the licensee shall not stay the Administrator's order when he advises the National Transportation Safety Board "that an emergency exists and safety in air commerce or air transportation requires the immediate effectiveness of his order." The Board is then required to finally dispose of the appeal within sixty days.

5. The administrative law judge upheld 15 of the 19 charges against Air East, 9 of 10 against McKinney, 7 of 8 against Tallent, 8 of the 9 against Wilkinson, and the 2 charges

petitioners appealed to this court. 49 U.S.C. § 1486.

Petitioners were charged with the improper operation of aircraft, including, *inter alia* :

1. allowing overloaded planes to take off;

2. permitting planes to fly without certain instruments being in proper working order;

3. permitting planes to fly after improper repairs;

4. flying below minimum approach altitudes;

5. using approaches to the airports at Johnstown and Altoona which were not approved by the F.A.A.;

6. deviating from assigned altitudes without permission; and

7. operating without current weather reports.

against Reddecliff, as well as 3 of the 4 charges against the repair station. The Board sustained the administrative law judge except for one of the charges against Tallent which it reversed.

**6.** Other additional charges included:

*Against Air East:*

1. instituting company practices which:
a. prohibited pilots from logging inoperable instruments and equipment;
b. required flight personnel to report such deficiencies on separate pieces of paper or orally to maintenance personnel;
c. prohibited maintenance personnel from entering repairs in the log until such repairs were completed;
d. allowed the operation of unairworthy craft; and forcing employee compliance by coercion and intimidation.

2. scheduling pilots for excessive duty without adequate rest;

3. improperly maintaining pilot flight time records;

4. utilizing pilots as required flight crew when they had not received initial flight training;

5. authorizing pilots to fly who had not completed proper flight, instrument and route checks;

6. failing to provide equipment so that pilots engaged in IFR and multi-engine operations could properly maintain and demonstrate their ability to conduct such operations;

Derelictions in record keeping were also alleged, including failing to prepare accurate weight manifests and computations of centers of gravity before take-off; falsifying records concerning flight checks given to pilots; falsifying records designating the supervisory mechanic responsible for repair of aircraft; and failing to enter mechanical deficiencies in the log. It was also charged that there were instances in which aircraft were put into service after improper repairs.[6]

Petitioners contend that:

1. the emergency revocation of the licenses without a prior hearing was a denial of due process;

2. the hearing which was granted denied due process;

3. the charges were not supported by probative and substantial evidence; and

4. the sanctions were excessive.[7]

7. failing to deliver summary reports to the Administrator relevant to propeller feathering in flight;
8. preventing pilots from attaining proficiency in more advanced flying techniques.
*Against McKinney, Tallent, and Wilkinson:*
1. failing to maintain minimum distances from clouds under VFR conditions;
2. continuously serving as pilots-in-command without current instrument checks;
3. accepting assignments in excess of the maximum allowable hours and without required amounts of rest.
*Against McKinney and Wilkinson:*
1. serving as pilots in aircraft and under conditions for which they had not been checked.
*Against McKinney and Tallent:*
1. operating unairworthy planes and continuing flights when they discovered the craft to be so.
*Against Reddecliff:*
1. performing inadequate repairs on aircraft and permitting their return to service in substandard condition.

7. Petitioners also allege that, in the absence of a finding that safety in air commerce or air transportation is involved, there is a lack of jurisdiction to revoke under 49 U.S.C. § 1429. However, the Board in its decision stated:

"Upon consideration of the briefs of the parties, and the entire record, the Board has determined that safety in air commerce or air transportation and the public interest require affirmation of the Administrator's or-

## I.

### THE EMERGENCY REVOCATION DID NOT VIOLATE DUE PROCESS

This investigation began on January 18, 1974, and during the following six weeks, F.A.A. officials interviewed present and former employees of Air East. Several potential witnesses were reluctant to have their roles made public, and they preferred that the investigators meet them privately at the witnesses' homes during nonbusiness hours. Some of the witnesses had experienced personal differences with the Air East management; some were hesitant to involve friends in the inquiry; several were themselves guilty of violations which might expose them to possible sanctions; and others, still employed by Air East, did not wish to incur the animosity of management. The preliminary investigation, therefore, was not open but was somewhat covert.

However, the F.A.A. did issue subpoenas to Air East for the production of records, and on February 19, 1974, an investigator deposed Reddecliff in the presence of his attorney. While the petitioners did not know all that was transpiring, certainly they were aware that a much broader investigation was underway than that focusing solely on the accident of January 6, 1974.

Petitioners assert that the Administrator's decision to revoke the certificates on an emergency basis denied them the opportunity for a hearing before being deprived of their livelihood. Unquestionably, as a result of the loss of certification, Air East was put out of business, and the pilots could not pursue their customary occupations without their licenses.

■ But under 49 U.S.C. § 1429(a), emergency revocation has an effect lim-

ited in time to a period of sixty days. While no hearing is required before revocation, the statute provides that an appeal by the licensee must be decided within sixty days. If the hearing establishes that the Administrator's action was not justified, the licenses can be restored immediately. Thus, while the action is termed an "emergency revocation," it is for all intents and purposes a suspension for sixty days or less. We point this out, not to invoke a *de minimis* concept, but to demonstrate that the statutory procedure does afford a prompt adjudication after revocation.[8] We do recognize that the suspension of a business for sixty days or a forced unemployment for that period is a grave matter which should not be treated lightly.

■ Due process is flexible and must be analyzed in the context of its application. What is reasonable in one situation where there is time to pursue a leisurely and reflective study of the circumstances may be impractical and dangerous to life itself in another situation. Here, the stakes were high indeed—a threat to the lives of passengers who entrusted themselves to an air carrier which they had every right to assume was in compliance with the strict regulations of a specialized government agency. Even though the loss of the privilege of operating aircraft, albeit temporary, is critical to those who are certified, that hardship is outweighed by the disaster that could befall the passengers.

When the balancing of the public interest in safety against a licensee's right to a hearing before revocation involves factors such as we have here, no extensive discussion of authority is necessary. We need only remark that in this instance we are not concerned with such relatively less critical problems as the desirability of the collection of a judg-

---

ders revoking the certificates of all six respondents."
There is evidence to support that finding and we will not disturb it.

8. Indeed, petitioners assert that they did not have sufficient time to prepare their defense and appeal to the Board. But, the expedited

disposition mandated by the statute is for the benefit of the licensees, and they were free to waive it. Probably, for economic reasons, petitioners chose not to do so. While recognizing their difficulties, we are not persuaded that prejudice resulted or that a hearing at a later date would have produced a different result.

ment by an individual against the holder of a driver's license,[9] or the possible difficulty of recoupment when a welfare payment is erroneously made.[10] Indeed, here the consequences of inaction may be even worse than where the seizure of misbranded food products before hearing has been sustained,[11] or where the justification for summary action was prevention of a bank failure.[12] And surely, if the summary seizure of property to collect taxes meets constitutional standards,[13] there can be no doubt of the result where the threat to life is real. *See also* Aircrane, Inc. v. Butterfield, 369 F.Supp. 598 (E.D.Pa.1974).

We do not mean to imply that an agency like the F.A.A. is to be given carte blanche to exercise its power arbitrarily and capriciously. If these were only minor violations of a bookkeeping or technical nature or more serious charges of dubious authenticity, obviously different considerations would apply. But here, the accusations went to grave wrongdoing which jeopardized public safety and were supported by statements of apparently knowledgeable individuals.

 Petitioners complain that, since the Administrator took six weeks to collect evidence and review it before *ex parte* revocation, the lack of urgency was patent. But that argument cuts another way as well. It demonstrates that the revocations were not hasty or ill-considered and took place only after serious efforts had been made to establish the validity of the charges. Once the Administrator concluded that irreparable harm could result at any time, withdrawals of operating privileges were justified, if not demanded, by the public interest. The reality of the safety hazard was sufficiently established by the preliminary investigation to justify the emergency procedures utilized here.

The petitioners were aware that an investigation was underway because they had been deposed and the company's records had been subpoenaed. To some extent, therefore, they had been given an opportunity to present explanatory material before the revocations occurred. There is no necessity, therefore, to consider under what circumstances an invitation to submit exculpatory material might be necessary before summary action by the Administrator.

 The petitioners urge that the statute is unconstitutionally vague in authorizing the Administrator to dispense with a prior hearing when "he is of the opinion that an emergency requiring immediate action exists in respect to air safety in commerce," 49 U.S.C. § 1485(a). They assert that "safety" is too general a term or, at the least, that some appropriate regulations should have been drawn to delineate the Administrator's discretion. But, the congressional intent is clear from the language of the statute. The primary concern is that of public safety, and in order to carry out the purpose of the legislation, the scope of authority was necessarily couched in broad terms. To limit the exercise of this discretion would be to frustrate the ends to which the statute was directed.

## II.

### THERE WAS DUE PROCESS AT THE HEARING

 Petitioners assert that they were denied a fair hearing because of procedural irregularities which occurred during the course of the administrative process. They cite as an example the Board's regulations which require the production of "a concise and complete statement of the facts relied upon."[14] The record reveals, however, that the administrative law judge at a pre-hearing

9. Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971).

10. Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

11. Ewing v. Mytinger and Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950).

12. Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947).

13. Phillips v. Commissioner of Internal Revenue, 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289 (1931).

14. 14 C.F.R. §§ 421.4(d), 421.23.

conference ordered the filing of a more specific statement by the Administrator. In response, the government submitted its so-called "Bill of Particulars" which, though not completely satisfactory to the petitioners, set forth in greater detail the various acts claimed to support the individual charges. Additionally, the names of witnesses who were expected to testify as to each count were included. Moreover, the government was required to deliver to petitioners' counsel copies of the depositions secured during the investigation period. The administrative law judge's orders effected a more comprehensive disclosure of the government's case than is customary in the normal civil or criminal cases in the district court. A reading of the transcript reveals that the administrative law judge was conscious of the burden imposed upon the petitioners by the stringent time limitation and, accordingly, ordered the government to do all but write a script for the hearing.

The petitioners pressed strongly for specific dates and times for each of the violations cited by the Administrator. In some instances, this was not possible because the witnesses had no independent means of fixing the precise day or hour when some of the incidents occurred. Understandably, this posed difficulties for the petitioners who might have desired to produce such data as weather reports to discredit testimony with respect to flying conditions. Nevertheless, it appears that the witnesses did their best to pinpoint dates when possible and narrowed times to weeks or months when no other data were available.

If only a single witness had provided this type of evidence, there might be difficulty in determining whether it was sufficiently probative to sustain the burden of proof. However, the cumulative effect of the testimony of the many witnesses who appeared and their complementary corroboration made it possible for the fact finder to decide the contested issues. In this proceeding as in most instances where oral testimony is important, absolute precision, desirable though it may be, was simply not possible. The generalizations were not more prevalent and, in fact, less so than in other proceedings. Cella v. United States, 208 F.2d 783 (7th Cir. 1953).

Other alleged deficiencies in the hearing process have also been urged upon us. We have examined them in the light of the record and find no prejudicial error.[15]

### III.

### THERE WAS SUBSTANTIAL EVIDENCE TO SUPPORT THE FINDINGS OF THE BOARD

■ In reviewing an appeal from the Board, we are bound by its findings of fact if supported by substantial evidence. 49 U.S.C. § 1486(e). We will not abdicate our function by defining "substantial" as a scintilla, Doe v. Dept. of Transportation, 412 F.2d 674 (8th Cir. 1969), see Davis, Treatise on Administrative Law § 29.01, but nevertheless, we must rely on the ability of the hearing officer to make judgments on witnesses' credibility. In that spirit we have evaluated the record, a voluminous one, and find that the substantial evidence test has been more than satisfied. What the petitioners urge, in effect, is to reverse the hearing officer's findings on the credibility of witnesses. We decline to do so.

■ Although it is true that a few of the witnesses may have had personal differences with some of the petitioners, not all did. Some of the witnesses had reason to fear F.A.A. proceedings for their own violations occurring while in the employ of Air East, but the fact that any of them had been promised consideration by the agency is not, in and of

---

15. Petitioners allege that (1) investigators destroyed their notes on interviews with witnesses (copies of the statements were produced); (2) the Administrator sent a letter to the Board containing allegedly prejudicial information (we do not find it so); (3) the findings of the administrative law judge did not comply with the regulations (we find the oral decision to be comprehensive and unusually well-detailed); and (4) oral argument before the Board should have been granted and the Board should have disqualified itself (we find no merit to these).

itself, sufficient to discredit their testimony. The possibility of bias was repeatedly drawn to the attention of the administrative law judge by petitioners' able counsel, and we have no doubt that this factor was properly evaluated before the decision was announced.

The only evidence presented in favor of the petitioners was their own testimony, and obviously, that had to be evaluated in the light of self-interest—certainly, as potent an element in credibility judgments as those which the petitioners find applicable to the government witnesses.

It is not necessary to review the evidence in detail. Instead, we will cite only a few examples to illustrate the nature of the testimony which petitioners would have us reject. For example, the petitioners denied all violations of overloading the aircraft on scheduled flights; yet, seven pilots testified that they had been ordered by petitioners McKinney and Tallent to ignore the weight limits so that flight schedules could be met. One of the witnesses related an incident which took place on August 13, 1973, when, as the result of an improper load balance, the plane nearly fell on its tail as passengers boarded.

Five pilots testified that they were instructed by the company to use unauthorized approaches at Johnstown and Altoona and that they, along with petitioner pilots, sometimes did so. Similarly, ten pilots detailed the company policy of flying below F.A.A.-prescribed minimum descent altitudes while under instrument flight conditions. Although petitioners deny such conduct, there is credible evidence to the contrary.

A telling example illustrating the difficulties of petitioners' case involved Air East's own weather observer. He testified that between the dates of May 22 and May 25, 1973, he was a patient in the hospital on self-care status.[16] Although he stated that he had prepared the weather and visibility reports at the airport during this period, the medical librarian from the hospital produced records indicating that the weather observer was actually in the hospital at those hours. The administrative law judge characterized this Air East employee as "a man who the evidence shows as worthy of absolutely no belief whatsoever."

Recitation of other instances described in the testimony would unduly lengthen this opinion. We think it sufficient to say that a careful review of the record reveals that the test prescribed for appellate review of administrative proceedings has been met.

## IV.

### THE SANCTIONS WERE NOT EXCESSIVE

We need only summarily treat the petitioners' contention that the sanction of revocation was not appropriate. The evidence of numerous incidents in which the public safety was compromised justifies the substantial deprivations imposed. They were within the scope of the authority granted to the Board and we find no error in the revocation orders.[17]

In summary, we find that the action of the National Transportation Safety Board was supported by substantial evidence and that the petitioners' procedural rights were not violated. Therefore, the decision of the Board will be affirmed.

16. Self-care patients were permitted to leave the hospital after hours only with their doctors' permission. In doing so, they were required to sign in and out, noting the times and dates.

17. There is a difference of opinion as to whether the enforcement provisions are intended to be remedial or punitive in nature. *See* Sabinske v. C.A.B., 346 F.2d 142 (5th Cir. 1965); Nadiak v. C.A.B., 305 F.2d 588 (5th Cir. 1962); Pangburn v. C.A.B., 311 F.2d 349 (1st Cir. 1962). That debate does not affect our decision here.

We have been advised that after one year petitioners may ask for reinstatement. We echo the caveat in Nadiak v. C.A.B., *supra*, that passing upon such an application is a matter entrusted to the discretion of the Administrator and that nothing we have said or have implied in this opinion is intended to apply in that context.