MONTGOMERY COUNTY,
MARYLAND, Plaintiff,

v.

Robert M. BALL, Commissioner of Social
Security, et al., Defendants.

Thomas D. LOWTHER and Thomas D.
Lowther, President, Police Association of
Montgomery County, Maryland, Inc.,
Plaintiffs,

v.

MONTGOMERY COUNTY, MARYLAND,
et al., Defendants.

Civ. Nos. 73–661–H and H–74–530.

United States District Court,
D. Maryland.

Dec. 17, 1975.

738

Martin J. Hutt, Deputy County Atty. for Montgomery County, Rockville, Md., for plaintiff Montgomery County, Maryland.

Peter I. J. Davis, Rockville, Md., for plaintiff Thomas D. Lowther.

James F. Truitt, Jr., Asst. Atty. Gen. of Maryland, Baltimore, Md., for defendant State of Maryland.

Henry Eigles, Columbia, Md., and Donald H. Feige, Asst. U. S. Atty., Baltimore, Md., for federal defendants.

**ALEXANDER HARVEY, II,** District Judge:

These two cases raise questions concerning statutory provisions which extend coverage of the Social Security Act to state and local governmental employees. By Order of this Court, these cases have been consolidated for all purposes pursuant to Rule 42(a) of the Federal Rules of Civil Procedure.

In Civil No. 73–661–H, Montgomery County, Maryland sues on behalf of its police officers,[1] while in Civil No. H–74–530, the President of the Police Association of that County brings suit on behalf of the Association and of the members of the County Police Department.[2] The consolidated amended complaint seeks a declaratory judgment providing that Montgomery County policemen are not within the coverage provided by Title II of the Social Security Act and injunctive relief compelling the Social Security Administration to terminate such coverage for the police officers retroactive to June 30, 1973. Named as defendants in such complaint are the Commissioner of Social Security, the Secretary of the Department of Health, Education and Welfare (hereinafter "the Secretary") and the Employees Retirement System of the State of Maryland. Jurisdiction has been asserted under 28 U.S.C. § 1331(a), under 42 U.S.C. § 405(g) and under 5 U.S.C. §§ 701, et seq.[3]

Section 218(a) of the Social Security Act, as amended, 42 U.S.C. § 418(a),[4] authorizes the Secretary to enter into an agreement with any state for the purpose of extending Social Security coverage to state and local governmental employees. After such an agreement has been in effect for five years, the state, pursuant to Section 218(g)(1)(B), may terminate that agreement "with respect to any coverage group designated by the State" by giving written notification two years in advance of termination.

In 1951, the State of Maryland and the Secretary's predecessor, the Federal Security Administrator, executed an agreement under Section 218(a) "for the purpose of extending the old age and survivors' insurance system established by Title .II of the Social Security Act . . . to services

1. There are 784 policemen employed by Montgomery County.

2. Montgomery County, Maryland was named as a defendant in Civil No. H–74–530. However, when these cases were consolidated, the County was realigned as a plaintiff in the consolidated case.

3. In denying defendants' motion to dismiss, this Court previously ruled that subject matter jurisdiction exists under 28 U.S.C. § 1331(a).

4. Reference will be made to sections of the Social Security Act rather than to Title 42 of the United States Code. The Code citation to that Title may be determined by adding 200 to the section numbers of the Act.

performed by individuals employed by political subdivisions of the State of Maryland." By 1958, this coverage included all employees of Montgomery County except police officers and elected officials. The police officers, as members of the Montgomery County Police Relief and Retirement Fund, were excluded from Social Security coverage by Section 218(d) of the Act, which provides that an agreement with a state may not include those governmental employees covered by a retirement system. However, Section 218(d)(3) permits the extension of coverage to governmental employees covered by a retirement system provided that a referendum is held and a majority of the eligible employees vote in favor of such coverage.

On April 5, 1965, Montgomery County police officers held such a referendum and ·voted in favor of being included within the outstanding agreement with the State of Maryland. Accordingly, the Chief of the Division of Social Security, Board of Trustees of the Employees Retirement System of the State of Maryland (hereinafter "the State Administrative Officer"), who is the state official empowered to seek modification of the agreement with the Secretary,[5] was notified by Montgomery County of the referendum vote. Social Security coverage for County police officers then became effective on May 30, 1965. However, as a result of an oversight, the agreement formally extending coverage to these policemen was not reduced to writing until almost seven years later when on January 11, 1972, Modification No. 200 to the Maryland Federal-State Agreement was signed by the appropriate federal and state officials.

On April 2, 1971, approximately six years after the coverage in question had become effective, Montgomery County policemen conducted another referendum and on this occasion voted to withdraw from Social Security coverage. The Montgomery County Council then formally notified the State Administrative Officer of the County's de-sire to terminate Social Security coverage for its policemen pursuant to Section 218(g)(1). The State Administrative Officer thereupon referred this request to the Regional Commissioner for the Social Security Administration.

Concluding that Montgomery County police officers did not constitute a separate "coverage group" under Section 218(g)(1)(B) of the Act, the Regional Commissioner denied this request for the termination of coverage. The State Administrative Officer thereupon filed an administrative appeal with the Social Security Administration. On February 2, 1973, the Commissioner of Social Security took action which in effect denied the State's appeal and affirmed the previous determination that the relevant coverage group for the purposes of terminating coverage was composed of all employees of Montgomery County and not merely of policemen. This civil action was thereafter filed.

In asking this Court to order the defendants to terminate Social Security coverage for Montgomery County police officers, plaintiffs advance several different arguments. First, plaintiffs assert that no valid agreement ever existed for extending Social Security coverage to Montgomery County policemen because the 1965 referendum did not comply with the requirements of Section 218(d)(3) of the Act. Secondly, plaintiffs contend that the Secretary is estopped from declining to terminate Social Security coverage for County policemen because the agreement between the Secretary and the State relating to such coverage was the result of material misrepresentations and should be rescinded or reformed by this Court. Thirdly, plaintiffs argue that Section 218 of the Act on its face should be construed to permit County police officers to constitute a separate coverage group for purposes of the termination of coverage. Finally, plaintiffs challenge the constitutionality of Section 218 on due process and equal protection grounds.

---

**5.** The relevant provisions of State law are to be found in Section 39 of Article 73B of the Annotated Code of Maryland.

Besides opposing these contentions on their merits, the federal defendants have renewed their objections to plaintiffs' standing to bring this suit and to this Court's jurisdiction. In support of their argument as to jurisdiction, the federal defendants rely on the Supreme Court's recent opinion in *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522, 43 U.S.L.W. 4985 (1975), which held that Section 205(h) of the Social Security Act precludes federal question jurisdiction in cases arising under Title II of the Act. However, in view of this Court's determinations following trial concerning the merits of this case, it is not necessary to re-examine in the light of the *Salfi* case the Court's previous ruling that it has subject matter jurisdiction.

### Validity of the Original Referendum

Social Security coverage under a federal-state agreement may be extended to governmental employees in positions covered by a retirement system only in accordance with the referendum procedures established by Section 218(d)(3). This Subsection provides in pertinent part as follows:

> No referendum with respect to a retirement system shall be valid for purposes of this paragraph unless held within the two-year period which ends on the date of execution of the agreement or modification which extends the insurance system established by this subchapter to such retirement system . . .

Relying upon this provision and in particular the word "execution", plaintiffs contend that no valid referendum was ever held under the Act because no written agreement extending Social Security coverage to County police officers was executed within the two years following the 1965 referendum. Pointing out that the written agreement in question was not signed until January 11, 1972 when Modification No. 200 was executed, plaintiffs contend that the 1965 referendum was invalid, that the County police officers were never properly included within Social Security coverage

and that the 1972 written agreement is null and void.

But plaintiffs blink at obvious facts when they assert that no agreement existed before Modification No. 200 was executed in 1972. Plaintiffs argue that the word "execution" in Section 218(d)(3) connotes a written and signed agreement and that Congress intended that the parties would be bound only if such an agreement existed. This Court would disagree.

▇ Unlike Section 218(g)(1) which explicitly requires notification "in writing" for termination of a federal-state agreement, section 218(d)(3) does no more than require that an agreement be put into effect within a two-year period after the referendum, if insurance coverage is to be extended to the coverage group in question. The legislative history of Section 218(d)(3) indicates that Congress imposed this two-year limitation to insure that, following a favorable referendum, state officials would act promptly to effectuate coverage for the appropriate employees. *See* Hearings on H.R. 7199 Before the House Comm. on Ways and Means, 83d Cong., 2d Sess. 396 (1954). Section 218(d)(3) is thus concerned with the time within which government officials must act to accomplish the extension of the coverage and not with the fixing of any precondition for the existence of any agreement at all. A statute must be construed to effectuate the apparent purpose and intention of Congress. *Crosse & Black-well Co. v. F.T.C.*, 262 F.2d 600, 605–606 (4th Cir. 1959). In this case, the parties acted promptly, and the agreement was put into effect at once, even though no formal writing was executed until some years later. The evidence indicates that the failure of the parties to sign a written agreement was the result of an administrative oversight which did not affect performance by the parties of the agreement.

▇ Moreover, the language of Section 218(d)(3) on its face does not require that a written agreement be signed within the two-year period for coverage to be effective. Absent a statutory definition or some other contrary indication, the words of a

statute are to be accorded their ordinary meaning. *See Caminetti v. United States,* 242 U.S. 470, 485–86, 37 S.Ct. 192, 61 L.Ed. 442 (1917); *United States v. Hunter,* 459 F.2d 205, 210 (4th Cir.), *cert. denied,* 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972). "To execute" may properly be construed to mean "to put into effect" or "to carry out fully and completely", and when referring to a legal instrument, may mean "to complete" or "to perform what is required to give validity to." *Webster's Third New International Dictionary* (1967).[6] Reducing an agreement to writing is undoubtedly one way of completing or giving validity to an agreement, but it is not the only way. The essential question under the statutory language here is whether the parties have performed all that is necessary to give validity to their agreement. Elementary principles of contract law show that, depending upon the intention of the parties, an agreement may be valid and complete before being reduced to a formal document. 1 Corbin on *Contracts,* § 30 at 98–99 (1963).

In *Krawill Machinery Corp. v. Robert S. Herd Co.,* 145 F.Supp. 554, 561 (D.Md.1956), *aff'd and remanded on other grounds,* 256 F.2d 946 (4th Cir. 1958), *aff'd,* 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959), Judge Thomsen, finding the existence of a contract based on mutual intentions, relied upon Section 26 of the *Restatement of Contracts,* which provides as follows:

> Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof . .

*Accord, Atlantic Banana Co. v. Standard Fruit & Steamship Co.,* 493 F.2d 555, 558 (5th Cir. 1974); *Banking & Trading Corp. v. Floete,* 257 F.2d 765, 769 (2d Cir. 1958); *Smith v. Onyx Oil & Chemical Co.,* 218 F.2d 104, 108 (3d Cir. 1955).

Despite the delayed execution of modification No. 200, the record in this case is replete with "mutual manifestations of assent" establishing that the parties agreed to extend Social Security coverage to County police officers in 1965 and that both sides in fact have performed under such agreement since May 30, 1965. The County police officers affirmatively voted for Title II coverage; the County Council passed a resolution approving such coverage; the County and the State have been reporting the wages of the police officers to the Social Security Administration since the second quarter of the calendar year 1965, and the Administration has continuously provided credited quarters of coverage with respect to such wages. Furthermore, beginning in 1967, County police officers and their families have been receiving the full range of benefits under Title II of the Act. Finally, the County police officers held a referendum seeking to withdraw coverage, thereby recognizing the existence of the agreement. Such conduct over a period of six years or more clearly establishes that an agreement for Social Security coverage of Montgomery County police officers existed long before January 11, 1972, when Modification No. 200 was executed. The circumstances here show that formal execution of the modification did no more than memorialize the parties' prior agreement. *See generally* 1 Corbin on Contracts, § 30 at 102–109 (1963).

For these reasons, this Court holds that within the meaning of Section 218(d)(3), the 1965 referendum was a valid one because it was held less than two years before the "execution" or putting into effect of the agreement extending Social Security coverage to police officers of Montgomery County.

### Estoppel and Mistake

Plaintiffs next challenge the validity and effect of the coverage agreement on the grounds of mistake and misrepresenta-

---

**6.** As one example of what would amount to an execution of an agreement, *Webster's Third New International Dictionary* refers to the "signing and perhaps sealing and delivering" of the document. Quite obviously, many other acts would also fit within the more general meaning given.

tion of material facts. Before the 1965 referendum was held, County police officers sought information from both federal and state officials concerning the procedure whereby they might at a later date withdraw from coverage if in fact they voted to be included in the system. From the evidence, it appears that the State Administrative Officer, then one Paul H. Fales, did inform members of the Montgomery County Police Relief and Retirement Fund before the 1965 referendum that they would constitute a separate "coverage group" for purposes of terminating the agreement with the Secretary pursuant to Section 218(g)(1)(B). However, the evidence in this case does not establish that such an affirmative representation was ever made by officials of the Social Security Administration. This Court finds that the federal officials did no more than inform County police officers of the statutory scheme for termination without expressly committing themselves as to whether County policemen constituted a coverage group.

Plaintiffs rely on the stipulated testimony of John A. Bechtel, who was President of the Police Association at the time of the 1965 referendum. According to Bechtel, a meeting was held on February 9, 1965, attended by members of the Association and by Charles M. Sylvester, then District Manager of the Social Security office for the District which included Montgomery County. Bechtel's testimony is to the effect that Sylvester, after telling the police officers that they could terminate their coverage after it had been extended, agreed to confirm his statement in writing. However, Sylvester could remember no such meeting,[7] and the letter in evidence from Sylvester to Bechtel did no more than outline the statutory requirements for termination and did not purport to define the term "coverage

group".[8] The evidence is thus not sufficient to establish that federal officials made affirmative misrepresentations at the time the 1965 referendum was held.

■ In any event, even if the representations relied upon were made, defendants would still not be estopped from asserting the defenses they have raised in this suit. A government agency cannot be held responsible for the erroneous statements and representations made by its agents. *See Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 384–85, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *United States v. Davenport*, 297 F.2d 284, 285 (4th Cir. 1961); *United States v. Woodland Terrace, Inc.*, 293 F.2d 505, 509 (4th Cir.), *cert. denied*, 368 U.S. 940, 82 S.Ct. 381, 7 L.Ed.2d 338 (1961); *Northeast Community Organization, Inc. v. Weinberger*, 378 F.Supp. 1287 (D.Md.1974); *Feil v. Gardner*, 281 F.Supp. 983, 985 (E.D.Wis.), *aff'd*, 402 F.2d 481 (7th Cir. 1968).

■ Plaintiffs contend that this doctrine has been eroded by decisions handed down in recent years. In particular, plaintiffs rely on an opinion of the Ninth Circuit which observed that "estoppel is available . . . against the government if the government's wrongful conduct threatens to work a serious injustice and if the public's interest would not be unduly damaged by the imposition of estoppel." *United States v. Lazy FC Ranch*, 481 F.2d 985, 989 (9th Cir. 1973). Even if such a standard were to be applied in the Fourth Circuit, this Court is satisfied that the circumstances of this case would not warrant a finding that estoppel should be here imposed.[9] The plaintiffs in this case have failed to establish that they have suffered and will suffer serious injustice if denied the right to withdraw from Social Security coverage.

7. Sylvester's deposition was taken before trial and, by agreement of the parties, was included as a part of the record in this case.

8. This was a letter dated February 11, 1965 from Sylvester to Bechtel discussing conditions under which Social Security coverage for State employees could be terminated. (Plaintiffs' Exhibit No. 27).

9. The equivocal nature of the alleged misrepresentation by *an agent of the federal defendants* may also preclude imposition of the doctrine of estoppel. *See generally* 2 Corbin on *Contracts*, § 201 (1963).

For these reasons, plaintiffs are not entitled to relief in this case because of any statements and representations made by state and federal officials in 1965.[10]

### Interpretation of the Statute

The contention most vigorously pressed by plaintiffs concerns the Secretary's interpretation of Section 218 insofar as this statute establishes a procedure for terminating Social Security coverage of a particular group under an existing state-federal agreement. Specifically, plaintiffs challenge the administrative interpretation of the term "coverage group" as used in Section 218(g)(1)(B). The pertinent provisions of the Subsection in question, entitled "Termination of agreement", are as follows:

> Upon giving at least two years' advance notice in writing to the Secretary [of Health, Education and Welfare], a State may terminate, effective at the end of a calendar quarter specified in the notice, its agreement with the Secretary
> * * *
> (B) with respect to any coverage group designated by the State, but only if the agreement has been in effect with respect to such coverage group for not less than five years prior to the receipt of such notice.

The Secretary has taken the position that the appropriate coverage group for termination is determined by reference to the employer entity itself, that is the state or political subdivision involved. In support of such interpretation, the Secretary relies on Section 218(b)(5) which, in part, defines the term "coverage group" as follows: "(B) employees of a political subdivision of a State other than those engaged in performing service in connection with a proprietary function; * * * "[11] The Secretary thus

contends that the appropriate coverage group for termination of coverage in this instance is an entity comprising all employees of Montgomery County. On the basis of such an interpretation, the Secretary has not permitted County police officers, as a separate group, to withdraw from the Social Security coverage which has been afforded since 1965.

On the other hand, plaintiffs rely on Section 218(d)(4), which they claim indicates that a retirement system such as the Montgomery County Police Relief and Retirement Fund constitutes a separate coverage group for purposes of termination of coverage. Pertinent provisions of Section 218(d)(4) are as follows:

> (4) For the purposes of subsection (c) of this section, the following employees shall be deemed to be a separate coverage group—
>
> (A) all employees in positions which were covered by the same retirement system on the date the agreement was made applicable to such system (other than employees to whose services the agreement already applied on such date);
>
> (B) all employees in positions which became covered by such system at any time after such date; and
>
> (C) all employees in positions which were covered by such system at any time before such date and to whose services the insurance system established by this subchapter has not been extended before such date because the positions were covered by such retirement system (including employees to whose services the agreement was not applicable on such date because such services were excluded pursuant to subsection (c)(3)(B) of this section).

---

10. The cases cited by plaintiffs in their briefs pertaining to estoppel, mistake and rescission of agreements between private parties are not relevant. As Justice Frankfurter observed in *Federal Crop Insurance Corp.*, "[i]t is too late in the day to urge that the Government is just another private litigant . . . ." 332 U.S. at 383, 68 S.Ct. at 3.

11. Other definitions of "coverage group" contained in Section 218(b)(5) are not pertinent to the circumstances of this case. Montgomery County police officers perform a non-proprietary function, and it does not appear from the record here that Social Security coverage has been extended in the County to employees performing a proprietary function. Thus, Subsection (D) of Section 218(b)(5) is not applicable in this case.

But other terms of Section 218 show that plaintiffs' position lacks merit. It is of course correct that Section 218(d)(4) provides that employees within such a retirement system "shall be deemed to be a separate coverage group." However, plaintiffs have failed to note the limited scope of this provision, which applies only "[f]or the purposes of subsection (c) of this section * * *"

Subsection (c) describes those services which may be included or excluded within a designated coverage group under a state-federal agreement. This Subsection, *inter alia* permits the state to request that employees covered by a retirement system be excluded from a particular coverage group and that an agreement be modified to include a coverage group to which the agreement did not previously apply. *See* Section 218(c)(3) and (4). The language of Section 218(d)(4), which is applicable only to Subsection (c), thus makes a retirement system a separate coverage group solely for the purpose of having such group originally excluded from a state-federal agreement or thereafter joined as a part of an existing agreement. However, it is Subsection (g) of Section 218 which governs the termination of any agreement by a state for any coverage group.

■ Thus, the members of a retirement system constitute a separate coverage group under Section 218(d) for purposes of *commencing* Social Security coverage (after initial exclusion) under the referendum procedures set forth in Section 218(d)(3), but not for the purposes of *terminating* their coverage under the procedures set forth in Section 218(g). Nowhere in the statute is there any language suggesting that once such a group has joined other County employees in the coverage provided under a state-federal agreement it may continue to maintain its separate identity for purposes

of termination of coverage. The provisions of Section 218(b)(5) which define "coverage group" apply generally to all of Section 218.[12] As Section 218(g) is silent as to the definition of a "coverage group" for purposes of termination, the general provisions of Section 218(b)(5) must control. Section 218(d)(4), relied upon by plaintiffs, in fact supports this interpretation. The definition contained there applies only "[f]or the purposes of Section 218(c)", indicating that the definition of "coverage group" contained in Section 218(b)(5) will be controlling for all other purposes, including Section 218(g).

■ Moreover, the record here indicates that since 1963 the Secretary has consistently construed Section 218 as prohibiting members of a retirement system like policemen from terminating coverage as a separate coverage group.[13] When presented with questions of statutory construction, a court should show "great deference to the interpretation given the statute by the officers or agency charged with its administration." *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Of course, a court need not "defer to an administrative construction of a statute where there are 'compelling indications that it is wrong.'" *Espinoza v. Farah Manufacturing Co.*, 414 U.S. 86, 94, 94 S.Ct. 334, 339, 38 L.Ed.2d 287 (1973). Moreover, a court should accord no weight to an agency interpretation that is not "consistent with the congressional purpose." *Morton v. Ruiz*, 415 U.S. 199, 236, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974).

■ Applying these standards, this Court concludes that the Secretary's longstanding interpretation of Section 218(g)(1)(B) is correct. Apart from the statutory distinction between proprietary and non-proprietary services, a "coverage group" under Section 218(b)(5)(B) means

---

12. The language used in Section 218(b) is that the definitions are "[f]or the purposes of this section—", that is, Section 218 in its entirety.

13. Regulations of the Secretary dealing with identification numbers for a coverage group suggest such an interpretation. 20 C.F.R. § 404.1240(b). Such Regulation provides in

pertinent part: "The term 'coverage group', as used in this section, means a 'coverage group' as defined in section 218(b)(5) of the act, and shall not include a 'coverage group' as defined in section 218(d)(4) of the act." The Regulations have included this language since 1955.

quite simply the "employees of a political subdivision." Such language may reasonably be construed, as the Secretary has done, to include all employees of a political subdivision. Administrative efficiency would obviously be enhanced if the political subdivision itself were treated as the controlling entity and if various sub-groups within such subdivision were not permitted to terminate coverage by separate action. Where an agency interpretation is a reasonable one, a court should respect the administrative expertise and not substitute its own views. *Udall v. Tallman, supra,* 380 U.S. at 16, 85 S.Ct. 792; *Jno. McCall Coal Co. v. United States,* 374 F.2d 689, 692 (4th Cir. 1967).

The question presented here first came to the attention of the Secretary in 1963. In that year, policemen in West Des Moines, Iowa were denied the right to terminate Social Security coverage for their particular group. On that occasion, the Secretary took the position that once coverage was effective under a state-federal agreement, coverage could be terminated only as to all employees of the political subdivision in question. Exhibits in this case show that the Secretary has consistently adhered to this position.[14] These exhibits, comprising letters and memoranda over the years since 1963, reflect the strength and consistency of the Secretary's position.[15] In *United States v. Midwest Oil Co.,* 236 U.S. 459, 472–73, 35 S.Ct. 309, 313, 59 L.Ed. 673 (1914), the Court, relying "on the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystallize into a regular practice," determined that a long-standing administrative interpretation tends to establish its own validity. *Accord, Chemehuevi Tribe of Indians v. Federal Power Commission,* 420 U.S. 395, 409–410, 95 S.Ct. 1066, 43 L.Ed.2d 279 (1975); *Udall v. Tallman,* 380 U.S. at 17, 85 S.Ct. 792.

██ Furthermore, it appears that the Secretary's interpretation of Section 218(g)(1)(B) derives support from Congressional silence. The record shows that Congress has been aware of the position taken by the Secretary and of the criticisms of such position.[16] Yet, Congress has taken no action to amend the Act. On the contrary, an amendment included by Senator Tunney in Section 218(g)(1), which would have permitted separate groups of policemen and firemen to terminate their coverage, was deleted, in conference, from the Social Security Amendments of 1972. *See* H.R.Rep. No.1605, 92d Cong., 2d Sess. 43, (1972); U.S. Code Cong. & Admin.News 1972, p. 4989 (Defendants' Exhibit 45). Such inaction on the part of Congress is some indication of Congressional approval of the interpretation accorded Section 218(g)(1)(B) by the Secretary. *See Chemehuevi Tribe of Indians v. Federal Power Commission, supra,* 420 U.S. at 410, 95 S.Ct. 1066.

For these reasons, this Court holds that Montgomery County police officers do not constitute a separate coverage group for the purpose of terminating Social Security coverage pursuant to Section 218(g)(1)(B) of the Social Security Act.

### Constitutionality of the Statute

As their final point, plaintiffs advance several constitutional arguments which do not merit extended discussion. Focusing on

---

**14.** Had representatives of the County Police Association checked with proper officials at the Department of Health, Education & Welfare in 1965, they would have learned of the Secretary's position on this issue *before* the original referendum was held. The Secretary's position was clearly stated in various documents in the Department's files.

**15.** In its brief, Montgomery County concedes "that Federal Defendant has over the years administratively taken the position that under Section [218(g)] only 'absolute coverage groups' may terminate their social security coverage. This administrative policy in interpreting section [218(g)] has effectively stymied attempts by policemen or firemen to withdraw from social security."

**16.** Correspondence between the Department of HEW and individual Congressmen show such awareness. Additionally, Senator Tunney brought the contrary position taken by policemen and firemen to the attention of the Senate in a speech before that body on June 15, 1972. 118 Cong.Rec. 20993–94 (1972).

the words "coverage group", plaintiffs first contend that Section 218(g)(1)(B) is unconstitutionally vague. Although conceding that the doctrine of vagueness has been principally confined to statutes proscribing criminal activity, plaintiffs rely on *A. B. Small Co. v. American Sugar Refining Co.*, 267 U.S. 233, 239, 45 S.Ct. 295, 69 L.Ed. 589 (1925), for the purpose of extending these constitutional principles to a statute which regulates civil conduct.

In *A. B. Small Co.*, the Court rejected a statutory defense to an action for breach of contract because the statute in question was unconstitutionally vague.[17] *Id.* at 238–40, 242, 45 S.Ct. 295. Recent cases indicate that statutes regulating civil conduct have on occasion been held to be subject to the doctrine of vagueness. *See, e. g., Boutilier v. Immigration and Naturalization Service,* 387 U.S. 118, 123, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967) (rejecting vagueness on the merits). However, the circumstances warranting application of this doctrine where civil conduct is involved have been quite limited. In *Marin v. University of Puerto Rico,* 377 F.Supp. 613, 626 (D.P.R.1974), the Court observed that the doctrine of vagueness should be applied to civil enactments "to provide fair warning to those governed by the rule, to guide the officials enforcing the rules thus preventing arbitrary or discriminatory enforcement, and to prevent infringement upon constitutionally protected activity." Of these, avoiding infringements on constitutionally protected activity would appear to be the most significant reason why a court might strike down a civil statute because it was unconstitutionally vague. *See Air East, Inc. v. National Transportation Safety Board,* 512 F.2d 1227, 1232 (3d Cir. 1975) (applying the vagueness test to a civil statute authorizing agency revocation of an airline's certification without a prior hearing).

■ In the present case, plaintiffs have not produced evidence showing that Section 218(g)(1)(B) infringes upon any constitutionally protected activity of theirs, or that any other grounds exist for application of the doctrine of vagueness. Moreover, even if the doctrine were to be applied to Section 218(g)(1)(B), plaintiffs would not be entitled to relief. When Section 218 is read in its entirety, the term "coverage group", as specifically defined in Section 218(b)(5), is not impermissibly vague. Any ambiguity which may arise results from plaintiffs' own efforts to extend the meaning of Section 218(d)(4) beyond the scope intended by Congress. This Court concludes that Section 218(g)(1)(B) is not "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).

■ Plaintiffs also argue that, in failing to recognize the members of the Montgomery County Police Relief and Retirement Fund as a separate coverage group, Section 218(g)(1)(B) denies them equal protection of the laws. Such argument is obviously without merit. The Equal Protection Clause of the Fourteenth Amendment, as applied to the federal government in *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), forbids different treatment of persons in like circumstances. *See Reed v. Reed,* 404 U.S. 71, 75–76, 92 S.Ct. 251, 30 L.Ed. 2d 225 (1971). Here, Section 218(g)(1)(B) accords the same treatment to all employees of Montgomery County. Rather than asking that their group be treated in the same manner as other County employees, plaintiffs are here seeking different treatment. The principles of equal protection would thus appear to support rather than condemn the statutory scheme.

### Conclusion

For the reasons stated, judgment is hereby entered in favor of the defendants, with costs. This Court's findings of fact and conclusions of law under Rule 52(a) of the

---

17. The same statutory provision had previously been declared unconstitutional vague in a criminal prosecution. *United States v. L. Co-* *hen Grocery Co.,* 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921).

Federal Rules of Civil Procedure are embodied in this Opinion, whether or not expressly so characterized.