**NORTHWEST AIRLINES, INC., Plaintiff,**

v.

**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Defendant.**

Civ. A. No. 84-3434.

United States District Court, District of Columbia.

Nov. 27, 1985.

Philip A. Lacovara, William R. Stein, Hughes, Hubbard & Reed, Washington, D.C., for plaintiff.

Eugene B. Granof, Legal Dept., ALPA, Intern., Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Before the Court are the parties' cross motions for summary judgment. Plaintiff Northwest Airlines (Northwest, Company) contests an arbitration award rendered by the Northwest Airlines, Inc. Pilots' System Board of Adjustment (the Board). That

award ordered the reinstatement of a Northwest pilot charged with flying a Northwest commercial passenger flight while under the influence of alcohol. Northwest seeks an order of this Court setting aside the award on the grounds that the arbitration Board exceeded its jurisdiction, acted contrary to law, and "violate[d] public policy." Defendant Air Line Pilots Association (ALPA), in turn, requests that the Court uphold the award and enforce the reinstatement order. ALPA contends that (1) the Board acted within the scope of its jurisdiction as defined under Section 204 of the Railway Labor Act, 45 U.S.C. § 184, and (2) the Northwest-ALPA collective bargaining agreement, and that both the Board's findings and conclusion are entitled to substantial deference upon review. ALPA further contends that the Board's decision is neither contrary to law nor inconsistent with traditional public policy concerns.

For the reasons set forth below, the Court concludes that summary judgment must be granted in favor of the plaintiff.

## I. *Factual Background*

Both parties agree that the material facts are not in dispute. Plaintiff Northwest Airlines, Inc. is a commercial passenger airline with air carrier service to a variety of cities within the United States and abroad. Defendant ALPA, an unincorporated association, is a labor organization. ALPA has served in the past—and currently still serves—as the collective bargaining representative for all pilots employed by Northwest. Larry W. Morrison is a former Northwest pilot.

On Friday, July 30, 1982, Morrison served as the co-pilot of Northwest Flight 125. The flight originated in Minneapolis, Minnesota, stopped briefly in Spokane, Seattle, and San Francisco, and concluded its journey in Las Vegas, Nevada. The plane arrived in Las Vegas at approximately 7:00 p.m. on the evening of the 30th. Morrison's expected stay in Las Vegas was to be brief; the reverse flight of flight 125—flight 81—was scheduled to leave approximately 30 hours later, at 7:40 a.m. on August 1, with Morrison once again serving as co-pilot. Majority Opinion (Maj.Opin.), System Board of Adjustment at 3.

On his arrival in Las Vegas, Morrison ate a sandwich, drank a beer, and bought two pints of vodka. *Id.* At "around midnight" of the 30th, *id.*, Morrison "chug-a-lugged" approximately ¾ of a pint of vodka in his room at the Hilton Flamingo Hotel, DX 5 at 3–4, and then went to sleep. When he awoke at 8:00 a.m. the next morning he "chug-a-lugged" an additional quarter pint of vodka, Maj. Opin. at 3, and then went back to sleep.

Waking for the second time at 2:30 p.m. on the afternoon of the 30th, Morrison decided to sunbathe at the hotel pool. There Morrison ordered and drank two double vodkas. *Id.* That evening Morrison ate at an Italian restaurant and consumed a liter of wine. He returned to his hotel room around 10:00 p.m., "chug-a-lugged" approximately ¾ of the second pint of vodka, and went to sleep. *Id.* at 4. Around 4:00 a.m. the next morning, less than four hours before the scheduled departure of Flight 81, Morrison awoke and finished the second bottle of vodka. *Id.*

At 6:30 a.m. the crew for Flight 81 gathered in the lobby of the Hilton Flamingo in preparation for the trip to the airport. Morrison did not appear. Second Officer Donald Allan called Morrison's room, spoke with Morrison, and reported to the rest of the crew that Morrison was sick, but would be right down. Soon thereafter Morrison paged John Dill, captain of Flight 81, from his hotel room and informed him that he (Morrison) was too ill to make the flight. Captain Dill immediately contacted Northwest's scheduling office to find a replacement for Morrison. Unable to locate a replacement, Northwest instructed Dill that if Morrison could not fly, the flight would have to be cancelled. Dill relayed this information to Morrison, and the latter agreed to make the flight—provided that Dill would fly the San Francisco and Seattle legs and that a substitute first officer would be brought on in Seattle. *Id.* at 4.

Dill and Morrison travelled to the airport together, arriving well before flight time. The Northwest station agent at the airport noticed that Morrison did not look well, and reported his observations to Northwest General Manager Donald Nelson. Nelson attempted to prevent Flight 81 from taking off, but his order was received only after the plane was airborne. Nelson then contacted Northwest representatives in San Francisco and left orders for Morrison to be replaced when the plane touched down. Nelson also instructed Northwest personnel to take a blood sample from Morrison upon his arrival in San Francisco.

At approximately 9:00 a.m. on August 1, 1982, Flight 81 touched down safely in San Francisco. Morrison was immediately replaced as first officer and directed to submit to a blood test. After some hesitation and consultation with an ALPA representative, Morrison agreed to cooperate. The test was administered at 10:46 a.m.—over two and one-half hours after Flight 81 had taken off from Las Vegas—and revealed that Morrison had a blood alcohol level by weight and volume of 0.13%.[1]

Northwest began an immediate investigation of the events leading up to the August 1, 1982 flight. At an August 6, 1982 Northwest hearing in Minneapolis, Morrison was questioned closely by company officials about past drinking habits and his activities during the Las Vegas layover. Morrison admitted that he had consumed substantial quantities of alcohol less than 24 hours before the departure of Flight 81, but insisted that his illness on the morning of August 1, 1982 was the result of a virus, not the drinking. Morrison confessed to Northwest officials that he had been "drinking straight from the bottle for some 10 years, sometimes consuming a pint of vodka on the 50-mile drive home, that he

would drink heavily on the first days of the 3-day Orient layovers he asked for and preferred, that he had suspicions he might be an alcoholic, but never sought treatment because he knew he would be 'canned.'" Maj. Opin. at 6–7. Morrison also told Company officials that the Las Vegas layover was not the first time that he had violated the "24-hour rule."[2] *Id.*

After the hearing Northwest formerly discharged Morrison. The Company concluded, based on the evidence before it, that the discharge was justified because Morrison had violated the Company's 24-hour rule and had flown under the influence of alcohol while serving as a cockpit crew member:

> Your dismissal is the result of your violation of Company rules and regulations prohibiting the consumption of alcoholic beverages within 24 hours of flight duty. On August 1, 1982, you were assigned to be an operating crew member of Flight 81 LAS–SFO. During the 24-hour period preceding the flight you consumed alcoholic beverages. This constituted just cause for your immediate discharge. Your misconduct was further aggravated in that you consumed sufficient quantities of alcohol so as to be under the influence of alcohol during the flight thereby jeopardizing the safety of the flight.

*Id.* at 8.

Both parties agreed to certain factual stipulations:

> (1) Larry Morrison admits consuming alcohol in violation of the Company's '24-hour rule' on July 31, 1982 and the morning of August 1, 1982.

> (2) Larry Morrison admits serving as a crew member on Flight 81 on August 1,

---

**1.** In California, a blood alcohol level of 0.10% creates a presumption of intoxication. Federal Aviation Administration regulations prohibit any person from serving as a crew member with a blood alcohol level of 0.04% or greater. 14 C.F.R. § 91.11(a)(4).

**2.** Northwest's "24-hour rule" prohibits crew members from using alcoholic beverages during

the 24-hour period "immediately preceding departure time [of] any flight to which [an individual has been] assigned as a crew member." PX 8. FAA regulations require only that a crew member abstain from drinking during the 8-hour period immediately preceding the flight. 14 C.F.R. § 91.11(a).

1982 from LAS to SFO while under the influence of alcohol.

(3) Larry Morrison has not presented a valid First Class Medical Certificate since August 1, 1982, and is not claiming any back pay from that date to the present.

(4) In the State of California, the legal level of blood alcohol establishing a presumption of intoxication is .10% (W/V) or greater. At 10:45 AM on August 1, 1982, Larry Morrison's blood alcohol content was .13% (W/V).

(5) Flight 81 was scheduled to depart LAS on August 1, 1982 at 7:40 AM. It actually departed LAS at 8 AM due to crew delay. Flight 81 was scheduled to depart SFO to SEA at 9:30 AM. It actually departed at 10:05 AM.

*Id.* at 9.

On August 16, 1982, Morrison protested the discharge and requested a second investigation and hearing. A second investigation and hearing was undertaken, and Northwest upheld its initial decision. Morrison then appealed to the System Board of Adjustment.[3] At issue before the Board was the question "whether or not the Company had just cause to discharge the grievant? [and] If not, what should the remedy be?" Memorandum in Support of Plaintiff's Motion for Summary Judgment at 6.

At the hearing before the Board, ALPA conceded that Morrison had violated the 24-hour rule, but contended that his discharge "was without just cause because his admitted rule violation was the unavoidable consequence" of alcoholism. Maj. Opin. at 9. ALPA insisted that Morrison had been completely rehabilitated, and had satisfied both the FAA, and Northwest's, requirements for reinstatement to active duty. ALPA did not request retroactive reinstatement. The Association asked the Board only to permit Morrison "to exercise his seniority as any other pilot returning from sick leave." Maj.Opin. at 26.

Northwest, in turn, argued that " 'as a matter of public policy and based on the obligation of a common carrier to promote safety to the highest possible degree, the Board has no jurisdiction to overturn the discharge.' " Memorandum in Support of Plaintiff's Motion for Summary Judgment at 7. The Federal Aviation Act, Northwest noted, "authorizes the *air carrier* to determine what safety policies should [be] adopt[ed] and how ... those policies ... should [be] enforce[d]." *Id.* (Emphasis added.) Regardless what the Company knew at the time of the discharge about Morrison's condition, " 'the better approach' is to reject entirely the concept of alcoholism as a defense to a 24-hour rule violation." Maj.Opin. at 25.

Over Northwest's objection, the Board considered evidence submitted by ALPA that described and evaluated the medical treatment received by Morrison after the discharge. Reduced to its essence, the evidence purported to show that:

(1) Morrison voluntarily entered an Alcohol Treatment Program in Washington State one day after the discharge;

(2) after resisting acceptance of his condition at the outset, Morrison made enormous strides toward understanding and controlling his dependency;

(3) on September 4, 1982, Morrison was discharged from the Alcohol Treatment Program after successfully completing the 28-day program;

(4) Morrison continued to meet on a regular basis with small groups of recovering alcoholics to talk over common concerns;

(5) in the 25-month period between the discharge from Northwest and the System Board hearing Morrison did not consume a single alcoholic drink;

(6) on January 10, 1984, the FAA Federal Air Surgeon declared Morrison "eligi-

---

3. Under the collective bargaining agreement, all "disputes between any employee covered by the Pilots' Agreement and the Company [Northwest] growing out of grievances or out of interpretation or application of any of the terms of the Pilots' Agreement" must be submitted to a three-member panel entitled "The Northwest Airlines Pilots' System Board of Adjustment." Joint Exh. (JX) 1 at 68–69. The Board must include one member appointed by the Company, one member appointed by ALPA, and one "neutral" member.

ble for special issuance of a First Class Airman Medical Certificate under Section 67.19 of the Federal Air Regulations," provided that he successfully complete a physical examination, and provided that he continue to test negative for alcohol use on a regular monthly basis.

The Board also heard testimony from medical experts discussing the nature of alcoholism, its origin and symptoms, its effect on those afflicted, and the manner in which it manifested itself in Morrison's particular case. The same experts gave opinions on the severity of Morrison's dependency, and the extent to which Morrison had regained "control" of his life.

After weighing all the evidence, the Board ruled on October 29, 1984 that Morrison had been discharged without just cause. The decision was split, with the Northwest representative voting to affirm the Company's decision. In a lengthy opinion, the System Board chairman found that "Morrison [had] violated the 24-hour rule on August 1, 1982 and [had] also participated in a flight with sufficient alcohol in his bloodstream to raise a presumption of intoxication...." Maj. Opin. at 27. Chairman Nicolau also found that on the day of the flight Morrison was "an untreated alcoholic" who had "crossed the line separating the problem drinker from one inflicted with the illness of alcoholism." *Id.* Although Nicolau concluded that Morrison was addicted and severely ill on the morning of the flight, he also found that the co-pilot was "out of control", and therefore not capable of performing a "volitional" act. Thus, even though Morrison had "committed serious offenses"—violations "[t]hat must weigh heavily against him"—*id.* at 38, those offenses were the "unavoidable consequence of the illness of alcoholism." That disease, the chairman went on to conclude, had subsequently been "arrested and successfully treated." *Id.* at 39. Indeed, the Chairman noted, the Federal Air Surgeon had found Morrison eligible for a special medical certificate that would clear him to fly provided monitoring requirements were met.

Under these circumstances, and given that Morrison had now regained "control over his behavior and [maintained] abstinence from intoxicants," *id.* at 38, the Board found it reasonable to conclude that reinstatement was appropriate. Accordingly, the Board granted an award offering Morrison reinstatement provided that he met the Federal Air Regulation's non-monitoring provision, *see* § 67.13[d][1][i]. Under that provision, Morrison would not be permitted to fly unless he demonstrated, to the satisfaction of the Federal Air Surgeon, that "established clinical evidence" indicated he had "recover[ed]" and "sustained total abstinence from alcohol for not less than the preceding 2 years." *Id.* In short, the Board granted Morrison a reinstatement, without back pay, fringe benefits, or "accumulation of longevity for pay purposes," on the condition that he demonstrate an ability to perform his duties, under FAA guidelines, without monitoring. *See* Award of System Board of Adjustment.

It is from this award that Northwest now appeals.

## II. *Regulatory Framework and Parties' Contentions*

### A. *Regulatory Framework*

To understand fully the parties' contentions a brief review of the applicable FAA regulations and Company rules is appropriate.

In order to fly a commercial aircraft in the United States, a pilot must obtain a pilot certificate. 14 C.F.R. § 61.3(a). A pilot must also have "in his personal possession" a "current medical certificate" that satisfies the requirements of 14 C.F.R. § 67. 14 C.F.R. § 61.3(c). Although "no person may act as a crew member of a civil aircraft ... [w]ithin 8 hours after the consumption of any alcoholic beverage ...; [w]hile under the influence of alcohol; or [while] using any drug that affects his faculties in any way contrary to safety," 14 C.F.R. § 91.11(a), a history of alcoholism need not preclude the issuance of a valid medical certificate. Under FAA guidelines,

a certificate can be held by an admitted former alcoholic if "there is established clinical evidence, satisfactory to the Federal Air Surgeon, of recovery, including sustained total abstinence from alcohol for not less than the preceding 2 years." 14 C.F.R. § 67.13(d)(1)(i)(c). If a pilot with an established medical history of alcoholism cannot meet the criteria of section 67.13(d)(1)(i)(c), he may still receive a "special issuance" medical certificate from the FAA if the Air Surgeon finds that piloting duties can be performed "without endangering air commerce." 14 C.F.R. § 67.19(a). A special issuance certificate may be issued on the condition that the pilot submit monitoring reports or undergo periodic medical tests. 14 C.F.R. § 67.19(d)(2).

For the most part, Northwest's own safety regulations parallel the FAA requirements. The Northwest Airlines Manual states that "[e]ach flight crew member is individually responsible for the maintenance of valid licenses as required by Federal Aviation Regulations and shall be thoroughly familiar with and shall comply with all FAA regulations pertinent to his licenses and air carrier operations." PX 3D.

In the area of alcohol use, however, the Northwest rules go beyond those provided by the FAA. The FAA's "8-hour rule", for example, has been extended by Northwest into a 24-hour rule. Violation of the rule constitutes grounds for immediate discharge.[4] Similarly, Northwest's policy on returning rehabilitated alcoholics to the cockpit is more severe than that established by the FAA. Although Northwest begins with the assumption that alcoholism is treatable,[5] the Airline's Manual makes

clear that alcoholic employees who violate Company rules—in this case the 24-hour rule—may be treated differently from employees with a history of alcoholism who come forward to seek treatment without violating Company rules:

The establishment of this policy in no way diminishes the Company's right and/or authority to discipline or discharge an employee for conduct that would warrant discipline or discharge of an employee who is not chemically dependent. Neither the availability of this policy, nor participation in any rehabilitation program pursuant to such policy, will excuse an employee from obeying all Company rules and regulations, including those pertaining to the use or possession of alcohol, drugs and/or narcotics. An employee's alcoholism or chemical dependency will be no defense to a proven violation of Company rules.

PX 8. Thus, Northwest will permit only a pilot "who does *not* violate the [24-hour] policy but who has ... a clinical diagnosis of alcoholism" to take a "personal leave of absence for a reasonable length of time for the purpose of obtaining professional assistance." PX 8 (emphasis added).

Likewise, Northwest will only permit a "non-rule breaking" pilot to return to the cockpit if he obtains an *unconditional* medical certification from the Air Surgeon:

*Exemptions and Return to Service*

a. A pilot who has a history or diagnosis of alcoholism or chemical dependency does not meet the requirements of the Federal Aviation Administration for a medical certificate which is required to permit continued service as a Northwest

---

**4.** *See supra* n. 2. The company's 24-hour rule unequivocally prescribes that:

"a. The use of alcoholic beverages by crew members while in uniform, on duty, on call or during the 24-hour period immediately preceding departure time on any flight to which assigned as a crew member, is prohibited ...

. . . .

"f. Violation of any of the above rules shall constitute sufficient cause for discharge."

**5.** The Northwest Airlines Manual subsection on "Alcohol, Drugs, and/or Narcotics" states that:

"The Company recognizes that alcoholism and other forms of chemical dependency are treatable conditions and that early detection and treatment may increase the likelihood of successful rehabilitation. This reference codifies long standing Company policies concerning the use of or addiction to alcohol, drugs, and/or narcotics and is to be used by managers in dealing with contract employees under their supervision. As with any Company policy, this policy will be reviewed for effectiveness and is subject to modification at any time." PX 8.

Airlines pilot *unless such pilot obtains an exemption from the disqualification by the Federal Air Surgeon. In order to return to service as a pilot for Northwest Airlines, the pilot must obtain an exemption which is unconditional* except to the extent continued professional counselling may be required for a reasonable period of time. An exemption which requires monitoring and certification of the continued abstinence of the pilot from alcohol, drugs and/or narcotics either by the Company or any of its employees or by any other person establishes that the Federal Air Surgeon is not satisfied the pilot has overcome the desire and need for alcohol drugs and/or narcotics. Under such circumstances, the pilot is not permitted by the Company to return to flying.

PX 8 (emphasis added). Possession of a "special issuance" medical certificate, although provided for under FAA regulations, *see* 14 C.F.R. § 67.19(d)(2), is insufficient for reinstatement by Northwest:

*Medical Certification and Alternative Employment*

a. Northwest's responsibility for the safety of the public not only permits but requires Northwest to make judgments on a reasonable basis as to the qualification and fitness of its pilots. It is Northwest's policy that unless and until the Federal Air Surgeon declares a pilot who has been diagnosed as an alcoholic to be free from the desire and need for alcohol so that monitoring of his/her continued abstinence is not required by any person, such pilot shall not be utilized to fly an aircraft.... If the Federal Air Surgeon is unable to declare a pilot free from the desire and need for alcohol, drugs and/or narcotics without monitoring within a reasonable period of time after a personal leave commences, that pilot must consider a career change where his/her propensity for the use of alcohol, drugs and/or narcotics will not endanger the lives and property of other persons. Such pilot will be considered for other employment with the Company.

PX 8.

All of these Company rules were enacted and enforced on the assumption that the FAA regulations set the floor, not the ceiling, for airline safety standards. Northwest is careful to point out that its strict standards are merely the fulfillment of an obligation imposed by the Federal Aviation Act to "perform [its] services with the highest possible degree of safety in the public interest." 49 U.S.C. § 1421(b). This "non-delegable duty", Northwest argues, is in effect a congressional mandate requiring a private air carrier to supply supplemental safety regulations where necessary.[6]

### B. *Parties' Contentions*

In its motion for summary judgment the plaintiff argues that the Board's arbitration award should be set aside on two separate grounds. First, Northwest contends that the Federal Aviation Act "preempts the Board's jurisdiction" over safety related matters. The Act, Northwest main-

---

**6.** The Federal Aviation Act, 49 U.S.C. § 1421, states in pertinent part that:

"(a) The Administrator is empowered and it shall be his duty to promote safety of flight or civil aircraft in air commerce....

....

"(b) In prescribing standards, rules, and regulations, and in issuing certificates under this subchapter, the Administrator shall give full consideration to the duty resting upon air carriers to perform their services with the highest possible degree of safety in the public interest and to any differences between air transportation and other air commerce; and he shall make classifications of such standards, rules, regulations, and certificates appropriate to the differences between air transportation and other air commerce. The Administrator may authorize any aircraft, aircraft engine, propeller, or appliance, for which an aircraft certificate authorizing use thereof in air transportation has been issued, to be used in other air commerce without the issuance of a further certificate. The Administrator shall exercise and perform his powers and duties under this chapter in such manner as will best tend to reduce or eliminate the possibility of, or recurrence of, accidents in air transportation, but shall not deem himself required to give preference to either air transportation or other air commerce in the administration and enforcement of this subchapter."
49 U.S.C. § 1421(a), (b).

tains, imposes a "non-delegable duty" on air carriers to operate with the greatest degree of safety possible. Northwest's alcohol-related rules were designed to fulfill that statutory obligation. By ruling that Morrison should not have been discharged because his alcoholism provided an "excuse," the Board allegedly nullified Northwest's safety-related policy of not permitting flight crew members to fly while intoxicated, or within 24 hours of drinking. Viewed in this light, Northwest argues, the Board usurped Northwest's authority over safety matters and acted in excess of its jurisdiction.

In presenting this initial contention Northwest does not suggest that it would never reinstate a pilot with a history of alcoholism. Rather, the Company takes the position that, unlike other alcoholic pilots, Morrison demonstrated "a judgmental deficiency" in choosing to "take the controls while intoxicated," as opposed to "calling in sick." Plaintiff's Reply at 3. Because the Board's decision "exalted" ALPA's goal of assisting alcoholics over Northwest's safety-related policy choice that rule violators—whether alcoholics or not—do not possess the "necessary character and judgment" to serve as pilots, the Board's decision effectively usurped Northwest's authority under the Federal Aviation Act. Put another way, Northwest argues that the Board lacked jurisdiction "to exalt *any* other objective over [Northwest's] facially reasonable program for protecting aviation safety." Plaintiff's Motion for Summary Judgment at 21. In Northwest's view, the Board's jurisdiction was limited to determining solely whether Northwest "had reasonable grounds for taking the action it [did] on August 6, 1982," Plaintiff's Motion for Summary Judgment at 26, or whether the alleged violation *"in fact* occurred." The Board did not have jurisdiction to "rely on ... *subsequent* events" to modify or "second guess" the penalty imposed. *Id.* at 29.

Northwest's second major argument focuses on public policy concerns. The Company takes the position that "the overriding public policy at stake in this case is

the clear statutory command that airlines assure ... the safety of the travelling public." Plaintiff's Motion for Summary Judgment at 32. A court, Northwest insists, may not enforce an arbitration award if the award is "contrary to public policy." Plaintiff's Motion at 29, *citing W.R. Grace & Co. v. Local 759, International Union of Rubber Workers,* 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983). The award issued by the Board in this instance, it is maintained, clearly violated the FAA's stated policy of prohibiting pilots from drinking and flying. Plaintiff's Motion at 33. As such, the award is contrary to the public policy of safeguarding the travelling public.

In response to these arguments, ALPA stresses the "narrow standard of judicial review" traditionally applied to cases involving arbitration awards, and argues that the jurisdiction of the Board is not preempted by the Federal Aviation Act. ALPA points out that "there is nothing in the text of the Act which states ... that safety is a matter committed 'exclusively' to air carriers," Defendant's Response to Plaintiff's Motion for Summary Judgment at 2, and maintains that the Board acted well within the scope of its authority in concluding that a penalty less harsh than discharge was appropriate for Morrison's transgressions.

ALPA contends that the Board did not "prefer alcoholic rehabilitation to aviation safety," *id.* at 10, but rather concluded— based on the evidence before it—that Morrison's reinstatement as a pilot posed no danger to air safety because the cause of the rule violations had been eliminated. ALPA emphasizes that the Board did not challenge the inherent validity of the Company's safety rules. To the contrary, the Board merely made a factual determination that Morrison's "judgmental deficiency" had been cured through subsequent treatment for alcoholism.

ALPA further argues that whether the Board possessed the authority to review the discharge decision and determine that

the penalty was too severe is a matter of interpretation falling within the exclusive jurisdiction of the arbitrator. This Court, ALPA contends, should not overrule the Board's interpretation of the collective bargaining agreement for the sole reason that the Board's interpretation differs from Northwest's.

Finally, ALPA insists that the public policy against drinking and flying "does not ... extend to precluding a System Board from ordering the conditional reinstatement of Larry Morrison." Response of Defendant to Plaintiff's Motion for Summary Judgment at 20. ALPA cites the testimony and writings of medical experts who take the position that reinstatement of rehabilitated pilots, like Morrison, poses no added danger to passenger air travel and serves as an incentive to "closet" alcoholic pilots to come forward and seek treatment. By blending rehabilitation and suspension, ALPA concludes, the Board's decision "tends to enhance" the public policy of promoting air safety by "mitigating the disincentive for peer identification of alcoholics who are actual or potential rule breakers ... [while] offer[ing] no guarantees that discipline ... will not be imposed if the circumstances warrant."[7] *Id.* at 22.

### III. *Analysis*

#### A. *Defining the Issue: The Competing Federal Policies*

Northwest is an air carrier as defined under Title II of the Railway Labor Act, 45 U.S.C. § 181 *et seq.* That Act requires that every carrier and its employees, "acting through their representatives," shall establish a Board of Adjustment to handle disputes "growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions...." 45 U.S.C. § 184. The collective bargaining agreement entered into by ALPA and Northwest incorporates the requirements of section 184. The agreement establishes a System Board to decide "disputes which may arise under

the terms of the Pilots' Agreement and which are properly submitted to it." JX 1 at 68–69. The Board "shall have jurisdiction over disputes between any employee ... and the Company growing out of grievances or out of interpretation or application of any of the terms of the Pilots' Agreement." *Id.*

■ Matters submitted by joint agreement to arbitration are subject only to a limited judicial review. The Supreme Court has expressly held that where a matter is properly before an arbitrator "the courts ... have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim":

> The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator ... [T]he moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.

*United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 567–68, 80 S.Ct. 1343, 1346–47, 4 L.Ed.2d 1403 (1960).

Deference is, however, not required in all instances. An arbitration decision will be overturned on review if the award purports to cover matters unconnected with the collective bargaining agreement:

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is

---

7. *See e.g.,* Appendices A–D accompanying ALPA's Motion for Summary Judgment. The theory proferred by ALPA rests on the assump-

tion that harsh penalties—like discharge—serve as a disincentive for alcoholic pilots to admit their dependency and pursue treatment.

legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*United Steelworkers of America v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960).

Consistent with this essentially narrow standard of review, the Railway Labor Act carefully enumerates the specific grounds required to set aside an arbitration order. Those grounds are limited to three: (1) failure of the board to comply with the provisions of the Railway Labor Act, 45 U.S.C. §§ 151–188; (2) failure of the board to confine itself to matters within its jurisdiction; and (3) fraud or corruption. 45 U.S.C. §§ 184, 153 First (q). *See Ozark Air Lines, Inc. v. Air Line Pilots,* 744 F.2d 1347, 1350 (8th Cir.1984); *Union Pac. Co. v. Sheehan,* 439 U.S. 89, 93, 99 S.Ct. 399, 401, 58 L.Ed.2d 354 (1978); *Diamond v. Terminal Railway Alabama State Docks,* 421 F.2d 228, 233 (5th Cir.1970).

■ The range of judicial review in Railway Act enforcement cases has been termed "among the narrowest known to the law." *Diamond,* 421 F.2d at 233. Under this statutory scheme, the federal courts must carefully avoid sitting as "super arbitration tribunals," *id.:*

> Once the court determines that the board acted within the scope of its authority— that is, that the board conformed to the limits on its authority set forth in the labor agreement, and that the award

draws its essence from the agreement— the court's task is finished. A court will not set aside an award rendered within the scope of the board's jurisdiction either for ordinary error or because the court would itself have reached a different resolution of the merits had the parties submitted the merits for judicial determination in the first instance.

*Ozark,* 744 F.2d at 1350. The Board's decision must be enforced unless the award is "without foundation in reason or fact." *Brotherhood of Railroad Trainmen v. Central of Ga. Ry. Co.,* 415 F.2d 403, 412 (5th Cir.1969). This test, in turn, hinges on "whether the remedy fashioned by the Board is rationally explainable as a logical means of furthering the aims of [the] contract." *Diamond,* 421 F.2d at 233. If the matter is properly before the Board, the arbitrator's factual findings are "conclusive." *Diamond,* 421 F.2d at 233.[8]

As a general matter, the federal policy favoring arbitration of labor disputes embodied in the Railway Act is based on the presumption that " 'arbitration is the substitute for industrial strife.' " *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 578, 80 S.Ct. 1347, 1350, 4 L.Ed.2d 1409 (1960), *quoted in Gateway Coal Co. v. United Mine Workers of America,* 414 U.S. 368, 378, 94 S.Ct. 629, 637, 38 L.Ed.2d 583 (1974). Because a collective bargaining agreement cannot "define every minute aspect of the complex and continuing relationship between the parties", arbitration serves an invaluable function as a means for resolving "unforeseen disagreements that inevitably arise." *Id.*

---

**8.** The limited standard of review permitted under the Railway Act is consistent with the Act's own purposes and legislative history. The Supreme Court has recognized that in enacting the Railway Act

"Congress endeavored to promote stability in labor-management relations in this important national industry by providing effective and efficient remedies for the resolution of railroad-employee disputes arising out of the interpretation of collective-bargaining agreements. The Adjustment Board was created as a tribunal consisting of workers and management to secure the prompt, orderly and final settlement of

grievances that arise daily between employees and carriers regarding rates of pay, rules and working conditions."
*United Pac. Co. v. Sheehan,* 439 U.S. 89, 94, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978) (citations omitted). The "effectiveness" of the Board, the Court reasoned, turns on its ability to keep "minor" disputes out of the courts and its ability to maintain "finality" in decision making. *Id.* A deferential standard of review clearly furthers both of these concerns insofar as it deters appeal of the order, and broadens the grounds for affirmance should an appeal in fact take place.

At the heart of the policy is respect for the contractual nature of the assignment. It is the arbitrator's construction of the agreement that has been bargained for by the parties. In most instances the labor arbitrator has been chosen "because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment...." *Id.* 363 U.S. at 581–82, 80 S.Ct. at 1352–53. To interfere with this process would upset a private contractual arrangement, frustrate the parties' common goal of maintaining "uninterrupted production," and jeopardize the parties' ability to ensure that the agreement "serve[s] their specialized needs." *Id.*[9]

 The legitimacy of the arbitration process, however, hinges on the arbitrator's adherence to the very agreement that the parties have "contracted" to honor. The award must "draw its essence" from the collective bargaining agreement, *Enterprise Wheel*, 363 U.S. at 597, 80 S.Ct. at 1361, and the arbitrator must be careful to confine his order to interpretation and application of the collective bargaining agreement. *Id.* Should the arbitrator "manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." *Id.* Clearly, a judicial decision setting aside an order that fails to adhere to the collective bargaining agreement does no violence to the federal policy favoring arbitration because the court is no longer interfering with a ruling "bargained for by the parties." In such a situation, the court is reviewing an order that has strayed from the underlying contractual arrangement.

In the case before the Court, neither side contends that the Railway Act's statutory scheme for judicial review or the federal policy favoring arbitration is inapplicable. At issue here is a second, equally important federal policy involving the safety of air travel. As noted at length above, Northwest contends that the award ordered by the System Board interferes with its responsibility under a conflicting federal statutory scheme set out in the Federal Aviation Act. *See supra* part II. B. This interference, Northwest argues, lifts the Board's decision out of the scope of the arbitrator's jurisdiction and places it squarely within one of the Railway Act's three enumerated grounds for substantive judicial review. Indeed, even Northwest's second argument focuses on air safety; Northwest argues in the alternative that even if the Board's decision does not fall within one of the Railway Act's special provisions, the Board's decision must be set aside because it violates the public policy justifications behind the federal "air safety" statutory scheme. *Id.*

The Federal Aviation Act states that "the Administrator [of the Federal Aviation Agency] shall give full consideration to the duty resting upon air carriers to perform their services with the highest possible degree of safety in the public interest ..." 49 U.S.C. § 1421(b). *See supra* n. 6. Federal regulations promulgated pursuant to the Federal Aviation Act make clear that it is the air carrier's responsibility to evaluate the competency of its pilots and detect defects in training and "personal characteristics that could adversely affect safety." 14 C.F.R. § 121.413(4)(i)(ii).

This Circuit has expressly stated that safety obligations must not be taken lightly:

> "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."
> *United Steelworkers*, 363 U.S. at 582–83, 80 S.Ct. at 1352–53.

**9.** The federal policy favoring arbitration is clearly stated in section 203(d) of the Labor Management Relations Act, 29 U.S.C. § 173(d):
"Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement."
The Supreme Court has made clear that doubts over the applicability of an arbitration clause should be resolved in favor of coverage:

The safe transportation of its passengers is the *essence* of [an airline's] business, *see Diaz v. Pan American World Airways, Inc.*, 442 F.2d 385, 388 (5th Cir.), *cert. denied*, 404 U.S. 950 [92 S.Ct. 275, 30 L.Ed.2d 267] ... (1971), and there exists a Congressional mandate that an airline must operate its business with "the highest possible degree" of care. 49 U.S.C. § 1421(b).

....

[T]he airline industry is one in which safety is of the utmost importance. The staggering death tolls and resulting human suffering which have followed some of our nation's horrible air disasters attest to this fact. Therefore, in our judgment the airline industry must be accorded great leeway and discretion in determining the manner in which it may be operated *most safely, Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224, 236 n. 30 (5th Cir.1976).

....

[S]afe is not sufficient. Rather, the 'safest' possible air transportation is the ultimate goal. Courts, in our view, do not possess the expertise with which, in a cause presenting safety as the critical element, to supplant their judgments for those of the employer.

*Murnane v. American Airlines*, 667 F.2d 98, 101 (D.C.Cir.1981).

Similarly, the Ninth Circuit has recognized that "federal law clearly places the responsibility upon the airline to determine whether or not a pilot possesses the judgment to serve as a Pilot-in-Command":

Federal law has pre-empted the area of aviation. *See* 49 U.S.C. § 1508(a) (1970); *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 638–39 [93 S.Ct. 1854, 1862–63, 36 L.Ed.2d 547] ... (1973); *United States v. Christenson*, 419 F.2d 1401, 1403–04 (9th Cir.1969). Congress had directed the Administrator of the Federal Aviation Administration to give full consideration to the duty resting upon air carriers to perform their services with the highest degree of safety in the public interest. 49 U.S.C.

§ 1421(b) (1970). The courts have recognized this duty. *Air East, Inc. v. National Transportation Safety Board*, 512 F.2d 1227, 1229 (3d Cir.), *cert denied*, 423 U.S. 863 [96 S.Ct. 122, 46 L.Ed.2d 92] ... (1975); *United Airlines, Inc. v. Wiener*, 335 F.2d 379, 389 (9th Cir.), *cert. dismissed sub nom. United Airlines, Inc. v. United States*, 379 U.S. 951 [85 S.Ct. 452, 13 L.Ed.2d 549] ... (1964).

....

Failure of an airline to comply with the provisions of the Federal Aviation Act and regulations issued pursuant to the Act can result in both administrative and civil penalties against the carrier. *See Air East, Inc. v. National Transportation Safety Board, supra*, and *In Re Paris Air Crash of March 3, 1974*, 399 F.Supp. 732, 747–48 (C.D.Cal.1975).

*World Airways, Inc. v. International Bhd. of Teamsters, Airline Div.*, 578 F.2d 800, 803 (9th Cir.1978).

It is apparent, therefore, that the federal policy of furthering safe air travel—as defined both by the courts and Congress—is strong. It is equally apparent, however, that the federal policy of resolving labor differences through arbitration is also strong. Seen from the perspective of competing federal policies, the issues before the Court may be reframed; that is, the parties' contentions may be consolidated into one central inquiry: which federal policy should take precedence over the other? Stated simply, the central question before the Court is whether the balance between the two federal policies lies sufficiently in favor of air safety to rule that the arbitrator has exceeded his jurisdiction or "acted contrary to public policy" in ordering Morrison's reinstatement. To resolve this question, the degree of interference with the federal interest in air safety must be weighed against the potential for harm that judicial review in this instance poses to the federal policy favoring arbitration.

### B. *Balancing the Interests*

In two important respects the arbitration award at issue here does not interfere with policy concerns that have formed the be-

drock of the federal policy favoring arbitration. First, the arbitration award does not deal solely with matters involving the interpretation and application of the collective bargaining agreement. Northwest's rules and regulations on the use of alcohol are contained in the Northwest Airlines Manual. *See* PX 8. There is no dispute as to what the rules require. The Manual expressly states that violation of the 24-hour rule shall constitute just cause for discharge. *Id.* at 6–8. The Manual also provides for preferential treatment for alcoholic pilots who voluntarily come forward without violating the 24-hour rule. The collective bargaining agreement makes no mention of the Company's policy on alcohol use. In ruling that Morrison should be reinstated even though he concededly fell within a category for which—under the Manual rules—discharge was justified, the Board patently attempted to apply and interpret a rule whose meaning was not in dispute and which was not included in the collective bargaining agreement.

Section 21(D) of the collective bargaining agreement provides that the Board shall have jurisdiction "over disputes between any employee ... and the Company growing out of grievances or out of interpretation or application of any of the terms of the ... Agreement." JX 1 at 68–69. One could argue that the application of the 24-hour rule to Morrison's particular situation constitutes a dispute "growing out of [a] grievance[ ]," *id.* at 68, and thus—to the extent discussed by the Board in its order—amounts to an "interpretation" or "application" of the collective bargaining agreement itself. This argument, however, is strained and unpersuasive. Clearly, the Board's Order is, in one sense, "related" to the grievance filed by Morrison. Yet the subject of the grievance is a matter about which the collective bargaining agreement is silent. The Board's Order is not limited to an examination of the facts forming the basis for the dismissal. Rather, it challenges the Company's own rules on alcohol use. The *effect* of the Board's Order is to deny Northwest's right to enforce its own carefully articulated alcohol use rules re-

specting 24-hour rule violators, rules made well known to those in its employ. This fact alone demonstrates that taken to its extreme—without regard to *effect*—the logic of the "grievance" argument would require that any matter—even one expressly delegated to the Company by law—fall within the Board's jurisdiction provided it were somehow "related" or "connected" to the reason for dismissal and the subsequent grievance. This would be an unrealistic result.

This is not to say that a safety-related matter may never be the subject of a Board's order. Were Northwest's rules on alcohol to be incorporated in the collective bargaining agreement, for example, an order applying those rules would clearly "draw its essence" from the agreement and pose no jurisdictional problems. *See e.g., Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 375, 94 S.Ct. 635. Such, however, is clearly not the situation here. *Cf. Mistletoe Express Service v. Motor Expressmen's Union*, 566 F.2d 692 (10th Cir.1977) (arbitrator obligated to conclude "just cause" for dismissal existed where bargaining agreement expressly stated that a specific form of misconduct justified discharge and arbitrator found employee had committed that form of misconduct); *International Ass'n of Machinists v. San Diego Marine Constr. Corp.*, 620 F.2d 736, 738 (9th Cir.1980) (arbitrator's decision to reinstate employee upheld where collective bargaining agreement did not expressly define employee's misconduct as misconduct constituting just cause for dismissal).

■ In short, judicial intervention in this instance need not interfere with the parties' contractual arrangement because no specific agreement was reached to submit safety matters to arbitration. To the extent that the Board's decision strays from a strict "interpretation and application" of the collective bargaining agreement, the award cannot be said to encroach upon the traditional respect federal arbitration policy affords private contractual agreements.

■ There is a second reason why this award does not trigger the same policy concerns that in other contexts have required judicial deference. Most arbitration disputes involve only two parties, both of whom have voluntarily consented to submit their claims to an arbitrator and have agreed to abide by the result. The award at issue here, however, concerns a third party—the air travelling public. That constituency is not a party to the collective bargaining agreement, has not participated in the selection of the arbitrator or arbitration board, and has not voluntarily consented to abide by the decision reached. Clearly, the import and relevance of a federal policy designed to preserve the contractual arrangement entered into by the two parties to the collective bargaining agreement lessens when a non-consenting third party becomes involved. The danger posed to that third party alone may justify judicial intervention. *See World Airways,* 578 F.2d at 803 n. 8 (distinguishing the holding in *Gateway Coal,* 414 U.S. 368, 94 S.Ct. 629, that safety matters are a valid issue for arbitration, on the grounds that there the dispute involved the safety of coal miners subject to the collective bargaining agreement, while the arbitration decision in *World Airways* affected safety of the travelling public, a constituency not a party to the agreement); *Johns-Manville Sales v. International Ass'n of Machinists,* 621 F.2d 756, 759 (5th Cir.1980) (upholding enforcement of an arbitration award permitting smoking in an asbestos plant workplace in part on the grounds that smoking, unlike air travel, "is principally a threat to the smoker ... who willingly courts [the danger]" and does not create a "serious potential danger to the health or lives of third persons [such as] aircraft passengers.").

While the foregoing indicates that review of the Board's Order need not interfere unduly with the federal policy favoring arbitration, the same cannot be said about the effect of the Order on the "strong federal policy in ensuring the safety of air travel." *World Airways,* 578 F.2d at 803.

■ ALPA is undoubtedly correct when it asserts that nothing in the text of the Federal Aviation Act expressly states that safety is a matter committed *"exclusively"* to air carriers. As noted above, the fact that the air carrier is "to perform [its] services with the highest possible degree of safety," 49 U.S.C. § 1421(b), does not mean that an arbitrator is necessarily precluded from ruling on a safety-related matter. *See Enterprise Wheel,* 363 U.S. at 597, 80 S.Ct. at 1361; *Gateway Coal Co.,* 414 U.S. at 375, 94 S.Ct. at 635. The more difficult question, however, arises in a situation similar to the one here where the safety rules are not part and parcel of the collective bargaining agreement. Although the Board purports to have issued a decision that affects only the penalty given to Morrison and not the underlying rule, the fact remains that the Order directly interferes with the implementation of certain carefully considered safety policies.

Northwest's policy on alcohol use is premised on three assumptions. First, Northwest reasons that 24-hour rule violators are less likely than non-violators to possess the quality of judgment that is desirable in a pilot. Second, Northwest takes the position that alcoholism is treatable. Third, Northwest assumes that by proffering the possibility of reinstatement—after rehabilitation—to non-violators who come forward voluntarily, alcoholism among Northwest pilots will be reduced. Taken together, these assumptions create a reasonable, rational policy on alcohol use that distinguishes 24-hour rule violators and non-violators. These rules are clearly set out in the Northwest Airline Manual and, as noted above, at no point did either party agree to place these rules in the collective bargaining agreement, or agree to delegate authority over interpretation or alteration of the rules to an arbitrator.

On its face the Board's Order appears innocuous. The Board terms its own action a "reduction of penalty", Maj.Opin. at 42, and carefully avoids challenging the validity of Northwest's safety rules. The *effect*

of the order, however, is quite different. Northwest's 24-hour rule—and the penalty of discharge that accompanies it—has nothing to do with the seriousness of a pilot's alcoholic history or his ability to overcome the disease. Rather, the rule is based on Northwest's conclusion that alcoholic pilots with the strength of character to admit voluntarily their handicap without violating the 24-hour rule are better suited to fly commercial airliners after rehabilitation than those who fly while under the influence of alcohol. The Board's decision, therefore, simply cannot be interpreted as a straightforward application of Northwest's policy on alcohol use. To the contrary, the decision transforms the policy by ignoring the stated purpose of one rule and misapplying the rationale from another. By concluding that Morrison is entitled to conditional reinstatement, the Board has, in essence, rewritten Northwest's policy on 24-hour rule violators to permit a special exception for those ex-alcoholic 24-hour violators who present evidence of recovery and rehabilitation. Stated differently, the Board has created a hybrid rule for "rehabilitated" 24-hour rule violators.

■ Much of ALPA's Memorandum in Support of its Motion for Summary Judgment is directed at the merits of Northwest's policy choice. ALPA makes much of the fact that in recent years rehabilitation programs have proven highly successful in treating alcoholic pilots and returning them to work. ALPA places con-

siderable weight on affidavits of medical experts testifying to the success of Morrison's treatment program and the prospects he holds for a successful future if returned to the job. All of these facts, while not unimportant in certain respects, are not relevant to the issues at stake here. Under the terms of the collective bargaining agreement, the Board has no authority to rewrite Northwest's safety rules, or to set new policy. For the purposes of this dispute, all that matters is that Northwest promulgated a clear, concise and rational rule, and the Board chose not to enforce it.[10] The fact that ALPA seeks to implement what it considers a "safer air policy" does not justify the degree of interference on Northwest's policies nor remedy the jurisdictional problems with the Board's Order.

■ The foregoing decision should not be read as a blanket proscription of System Board involvement in safety-related matters. If safety rules are listed as a legitimate subject for arbitration under the collective bargaining agreement, or if the rules are clear, judicial review might well not be permissible. Similarly, were the dispute limited to a determination of the facts underlying an alleged rule violation, exercise of jurisdiction by the Board might be proper. See *Mistletoe Express Service*, 566 F.2d 692 (upholding arbitrator's decision to dismiss on grounds that arbitrator

---

10. Despite ALPA's assertions, Northwest's policy is not inherently unreasonable. As a practical matter, rehabilitation in an alcohol treatment program may not improve a pilot's judgment. Thus, if the reason for Morrison's dismissal was his decision to crew the plane while intoxicated, subsequent treatment for alcoholism will not necessarily remedy the recklessness, and incredible disregard for his passengers' safety that he demonstrated in co-piloting the plane. Indeed, Mr. Morrison had asserted that he had known for a long time that he was probably an alcoholic yet elected to not treat his illness.

ALPA, and the Board, of course, would respond that Morrison's actions at the time were somehow involuntary—the "product" of the disease of alcoholism. Initially, this argument seems unpersuasive. Surely it is one thing to feel a compulsion to reach for alcoholic liquors

and another to feel the same compulsion to reach for the controls of a plane while under the influence of intoxicating beverages. Moreover, numerous admitted alcoholic pilots have demonstrated the judgment to come forward *without* violating the rule against drinking and flying. The existence of Northwest's own "bifurcated" policy on alcohol use is testimony to that fact.

Medical opinion on this point, however, is divided. Much research continues to be done in the area of alcoholism and voluntary conduct. Under the circumstances it was not unreasonable for Northwest to conclude by way of its 24-hour rule that character defects/judgments exhibited at the time of the violation are unlikely to be remedied by subsequent treatment for alcoholism.

found that employee had committed the proscribed form of misconduct).

▆▆▆ But where, as here, a clearly defined safety regulation or policy is rewritten without express authorization under the collective bargaining agreement, the Board's decision extends too far. Under these circumstances, the arbitration Board has exceeded its jurisdiction not because the Company retains *exclusive* jurisdiction over safety matters under the FAA, but because the Board's decision substantially interferes with air safety responsibilities entrusted to Northwest without encroaching unduly on concerns underlying federal arbitration policy.

This interference with Northwest's safety obligations takes on an even more serious cast when viewed in terms of a traditional "public policy" analysis. No citation of authority is required to establish that intoxication and piloting—when performed together or in close succession—does not serve the public interest. In the words of one circuit court:

> [a]lcohol impairs a person's coordination, and inhibits his ability to reason rationally. Ingestion of alcohol slows the reflexes. It induces drowsiness. It slows response time to external stimuli. It dulls the senses. In recognition of alcohol's undisputedly debilitating characteristics, every state in the union prohibits driving while under its influence.

*Amalgamated Meat Cutters v. Great Western Food Co.*, 712 F.2d 122, 124 (5th Cir.1983). Nowhere are reflexes and "the ability to reason [quickly and] rationally" more important than in the cockpit of a jet liner. A pilot or a co-pilot may have but seconds to make a decision or execute a maneuver that will determine the fate of hundreds of passengers. No one can "overlook the horrible toll in human life that air crashes can take." *World Airways*, 578 F.2d at 804.

▆▆▆ The public policy against the use of alcohol and flying is "well-defined and dominant." *See Amalgamated Meat Cutters*, 712 F.2d at 124 (setting forth standard to be used in determining what consti-

tutes a public policy violation). C.F.R. regulations promulgated pursuant to the FAA clearly reflect a national policy against the use of alcohol or drugs by airline crew members. *See* 14 C.F.R. § 121(4)(i)(ii); 14 C.F.R. § 91.11(a). *Cf. Johns Manville Sales*, 621 F.2d at 759 (arbitration award permitting smoking at workplace upheld as not contrary to public policy because decision did not offend a national policy—as reflected in agency rules or regulations—against smoking in asbestos plants); *Amalgamated Meat Cutters*, 712 F.2d at 124–25 (citing provisions of the Federal Motor Carrier Safety Regulations as evidence of the national policy against drinking and driving). Thus, to the extent that the reinstatement order interferes with the Company's safety obligations under the FAA, the Board's award is contrary to public policy.

This last point is significant not simply because it underscores the seriousness of the intrusion on federal air safety policy, but also because it provides an added, independent reason why the award should be held unenforceable. *See Amalgamated Meat Cutters*, 712 F.2d at 124 ("[e]nforcement of an arbitration award should be denied if ... the award ... would violate public policy"; and "public policy necessary to prevent enforcement ... must be 'well defined and dominant, and is to be ascertained "by reference to the laws and legal precedents" ' "); *Johns-Manville Sales*, 621 F.2d at 757.

ALPA argues that the "dominant public policy" should be defined not just in terms of 24- or 8-hour rules, but also in terms of "deterrence." Rehabilitating and reinstating pilots with a history of alcoholism, ALPA insists, should be viewed as consistent with public policy because it serves to encourage alcoholic pilots who might otherwise have kept their "illness" a secret to come forward in search of help.

While this approach to the airline industry's alcoholism problem may have proven both workable and effective, it cannot be overlooked that national policy—when "ascertained by 'reference to the laws and

legal precedents and not from general considerations of supposed public interests'"—incorporates both the concept of deterrence (through rehabilitation and reinstatement), and that of incapacitation (dismissal for violation of a 24- or 8-hour rule). *Amalgamated Meat Cutters*, 712 F.2d at 124. It is impossible to conclude, therefore, that the Board's interference with Northwest's enforcement of its 24-hour rule was entirely consistent with public policy.

## IV. *Summary*

Weighing the concerns that underlie the federal policies placed in issue by the Board's order, it is apparent that in this instance the Board has exceeded its jurisdiction and unduly interfered with the federal interest in air safety. Although the FAA does not delegate safety matters exclusively to airline management, an air carrier bears considerable responsibility for ensuring that services are performed with the "highest possible degree of safety." 49 U.S.C. § 1421(b). Here the Board's decision significantly hampers Northwest's ability to fulfill its responsibility while simultaneously failing to promote traditional policy concerns that underlie the competing federal interest favoring arbitration.

The situation at issue here is unique in several respects. First, unlike a traditional arbitration dispute, the Board's decision does not purport to resolve a question of interpretation arising directly from the terms of the collective bargaining agreement. The subject matter of the dispute concerns the application of a Company rule that—on its face—is patently clear. If the dispute can be said to arise from the collective bargaining agreement at all it is only because the matter is arguably related to a "grievance." One must strain the holding of *Enterprise Wheel*, however, to conclude that this link is sufficient to find that the award "draw[s] its essence from the labor agreement." At best, the subject matter of the dispute sits only on the outer perimeter of the arbitrator's jurisdiction.

Second, the effect of the order is not limited to two parties who have contracted willingly to accept the arbitrator's decision. Involved here is a critical third party—the air travelling public—whose interest requires protection and who has not consented to have its interests arbitrated by the Board. These factors—the presence of a third party and the lack of a clear connection between the subject matter of the dispute and the terms of the collective bargaining agreement remove this case from the category of traditional arbitration disputes for which the policy of judicial deference was designed. In short, judicial deference under these circumstances will not promote the rationale behind the federal policy favoring arbitration; and conversely, failing to defer need not harm the federal interest in arbitration.

The award's effect on the federal interest in air safety, however, is entirely different. The Board's decision significantly encroaches on Northwest's responsibilities to the air travelling public. Stated simply, the decision requires Northwest to reinstate a pilot it believes is unfit for the weighty responsibilities of the position.[11] The Order imposes this result on the Company even though the majority opinion concedes that the facts surrounding the discharge—as alleged by Northwest—are accurate, and even though no direct challenge is made either to Northwest's authority to promulgate rules that reflect its policy on alcohol use, or to the meaning of the specific Northwest Airlines Manual rule used to discharge Morrison. Under the guise of a debate over application of policy and rules, the Board's decision substitutes its own policy for Northwest's.

When the degree of interference with air safety interests is weighed against the min-

---

11. The decision requires reinstatement provided certain conditions are met, but all of those conditions rest outside of Northwest's control. The fact remains that under the terms of the order, Morrison can be reinstated without Northwest's concurrence or consent.

imal potential for harm that judicial review poses in this instance to the federal policy favoring arbitration, it is clear that on balance the Board has unjustifiably exceeded its jurisdiction. Under the terms of the Railway Labor Act, therefore, reversal is required. 45 U.S.C. § 153 First (q) (exception (2): "failure of the Adjustment Board to conform, or confine, itself to matters within the scope of its jurisdiction"); *see Union Pac. R.R. Co.*, 439 U.S. at 93, 99 S.Ct. at 401.

Confronted with strong, conflicting federal policies, it is frequently impossible to conclude with precision which interest must prevail. Here, as in other cases, the balancing of benefits and harms required to determine if an arbitration board has exceeded its jurisdiction is an inexact science—one that does not render "yes" or "no" answers. Yet, in this instance, any uncertainty in the relative weight to be assigned the competing sides of the debate is eliminated by the presence of unique, albeit exigent, circumstances that must be considered in the overall calculus. One need not be an aviation expert to appreciate the enormity of a pilot's responsibility, and the seriousness of the consequences should that responsibility not be met. Unlike many other professions, piloting leaves little margin for error. It is for this reason that both an employer and the air-travelling public have a right to expect, and rely on, a high level of trust and commitment from those who are employed to fly passenger aircraft. A court must tread with exceeding caution before *requiring* an air carrier to reinstate a pilot who has breached that trust.

### V. *Conclusion*

For the reasons set forth above, summary judgment shall be granted in favor of plaintiff Northwest Airlines. The Adjustment Board's decision of October 29, 1984, shall be reversed. A separate judgment accompanies this Memorandum Opinion and Order. All additional outstanding motions are denied as moot.